[No. B222455. Second Dist., Div. Eight. Apr. 6, 2011.]

LIBERTY NATIONAL ENTERPRISES, L.P., Plaintiff and Respondent, v. CHICAGO TITLE INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Hennelly & Grossfeld and Susan J. Williams for Defendant and Appellant.

Shernoff Bidart Echeverria, Michael J. Bidart, Ricardo Echeverria; McDougal & Associates, Donald C. McDougal, Jr., Norman Paul Breen; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiff and Respondent.

## OPINION

**FLIER, J.**—Respondent Liberty National Enterprises, L.P. (Liberty), owns the Broadway Trade Center (BTC) in downtown Los Angeles. In May 2002, Liberty was served with an action that challenged its exclusive ownership of BTC. Liberty tendered the defense of this action to appellant Chicago Title Insurance Company (sometimes referred to as Chicago), which was refused. Liberty, represented by Attorney Donald C. McDougal, brought an action against Chicago in which it alleged that Chicago's denial was in bad faith.

The trial was divided into three phases. Coverage was the first phase. When this concluded favorably to Liberty, Chicago changed counsel; new counsel moved to disqualify McDougal. Chicago contended that McDougal had learned confidential information about its claims policies when McDougal represented Chicago from time to time prior to 1995 and that McDougal should also be disqualified because he was a witness in the case. The trial court denied the motion and Chicago has appealed from this order. We affirm.

### ATTORNEY McDOUGAL AND CHICAGO TITLE INSURANCE COMPANY

Prior to 1995, McDougal was hired by Chicago approximately 12 times to represent individuals or entities that had purchased title policies from Chicago and that had made claims under those policies. These cases involved failure of title, easement disputes and issues of ingress and egress; the last of these cases came to McDougal in 1995. According to McDougal, during the time he represented Chicago's insureds, "I never performed any work for CHICAGO regarding any claims of 'bad faith' by the company. Moreover, I was never hired by CHICAGO to review or analyze its claims processing procedures. By the time I was hired to represent an insured, the person's claim had already been reviewed and accepted by CHICAGO. I thus had no reason or occasion to examine the manner in which claims were handled by CHICAGO."

At his deposition, McDougal testified that he was also retained by Chicago to review coverage issues and on occasion he was consulted by Chicago on

whether to issue a particular policy or whether to require special endorsements on a policy. He did not prepare written coverage opinions, however, and was used more as a sounding board on given problems.

McDougal has represented Liberty since it was formed in 1993. He assisted Liberty in the purchase of BTC and it was McDougal who advised Liberty to purchase a title policy from Chicago. "[I]t was my belief that CHICAGO had the best claims department and a reputation for standing behind its policies when insureds had claims. . . . [¶] . . . I tendered [the] defense . . . to CHICAGO on behalf of my client, LIBERTY. I was absolutely shocked when the claim was denied in July 2002."

McDougal contacted people he knew in the title insurance industry and learned that a major change had been made in the claims handling process when Chicago was acquired by Fidelity National in 2000.

## PROCEDURAL HISTORY

Liberty's original complaint was filed on November 5, 2007. Chicago first appeared in the case in December 2007, represented by Steve Garcia of Knapp, Petersen & Clarke. "I [(McDougal)] told Attorney Garcia during one of our first conversations in late 2007 that I used to be hired by CHICAGO to represent its insureds during the period from about 1987 to 1995. . . . At no time prior to CHICAGO switching attorneys in late August 2009 did Attorney Garcia or anyone else associated with CHICAGO claim that I should be disqualified from representing LIBERTY based on my having worked for CHICAGO's insureds many years ago."

The case was vigorously litigated beginning in late 2007. There was at least one demurrer; the usual case management and status conferences; discovery requests addressed to Chicago beginning in November 2007; depositions of one principal each for the two parties; a neutral evaluation conference; and the trial of the first phase (coverage) on March 25 and 26, 2009.[1] McDougal participated in the proceedings dealing with the statement of decision after the trial court announced its intended decision following the conclusion of the first phase.

While the statement of decision was being finalized, Chicago discharged Knapp, Petersen & Clarke and substituted in its stead Hennelly & Grossfeld. On November 10, 2009, the latter wrote McDougal a lengthy letter in which it stated, among other things, that Chicago objected to McDougal's use of the

---

[1] The projected second phase addressed damages and the third phase was for determination of bad faith and punitive damages.

knowledge of Chicago's claims practices "gained while he represented the company" that he was now suing. The letter stated that during a telephone conversation on the occasion of a "meet and confer" McDougal had said that he knew about Chicago's claims practices, that it had the best claims policies and personnel and that it was the best in the industry in claims handling. The letter stated that Chicago would move to disqualify McDougal.

Chicago filed the motion to disqualify counsel on December 18, 2009.

## THE TRIAL COURT'S RULING

The court's minute order states that Chicago "provides no explanation for why it waited for two years, after the conclusion of a lengthy trial in this case on liability, to move to disqualify plaintiff's counsel, a counsel that has represented plaintiff from the inception of this case." The court found that claims handling had been an issue in this case from day one. "New defense counsel's attempt to argue that defendant did not know the basis for its motion until a recent meet and confer is also not convincing" in light of the fact that claims handling was an issue from the inception of the case. Finally, the trial court concluded that Liberty "would be extremely prejudiced" if McDougal were disqualified. McDougal had won the liability phase and had been Liberty's "long-time counsel throughout the events that [led] up to the filing of the instant case."

As to McDougal's role as a witness in the case, the trial court found that Liberty consented to this and therefore rejected the claim that McDougal should be disqualified because he was also a witness.

## DISCUSSION

### 1. *Disqualification of Counsel May Be Waived*

■ We recognize that there are some courts that have held that disqualification of counsel cannot be waived even when the motion is brought after an extremely long passage of time. (Flamm, Lawyer Disqualification (Banks & Jordan 2003) § 21.1, pp. 394–395, citing inter alia, *State ex rel. Oklahoma Bar Assn. v. Berry* (1998) 1998 OK 73 [969 P.2d 975, 978].) The rationale of these cases is that ethical rules serve a public interest, which precludes representation by a lawyer who should be disqualified. California, however, is not one of the jurisdictions adhering to this view. (E.g., *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 599 [283 Cal.Rptr. 732].) In fact, the majority view appears to be that attorney disqualification can be impliedly waived by failing to bring the motion in a timely manner. (Flamm, Lawyer Disqualification, *supra*, § 21.1, pp. 396–397.)

It appears that, at least in California, the delay has to be extreme or unreasonable before it operates as a waiver. (*Western Continental Operating Co. v. Natural Gas Corp.* (1989) 212 Cal.App.3d 752, 764 [261 Cal.Rptr. 100] [the delay "was not extreme or unreasonable"]; *Forrest v. Baeza* (1997) 58 Cal.App.4th 65, 78 [67 Cal.Rptr.2d 857] [the delay was "insufficiently extreme"].) It has been held that when the party opposing the motion has made a prima facie showing of unreasonable delay causing prejudice, disqualification should not be ordered, and the burden shifts to the moving party to justify the delay. (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 599.) It has also been held that the prejudice to the opponent must be extreme. (*Ibid.*)

## 2. *The Delay in Bringing the Disqualification Motion Was Unreasonable*

The question before us is whether the trial court abused its discretion in denying the motion to disqualify McDougal.[2] In large part, the court's decision was based on the delay in filing this motion. We therefore address the question whether the delay was unreasonable.

Chicago claims that there was no delay because it acted promptly upon learning from McDougal during a "meet and confer" in October or November 2009 that McDougal knew Chicago's claims procedures and "was actively using that information against Chicago on Liberty's behalf."

There is no citation to the record where it might be shown that McDougal was "actively using that information against Chicago." In fact, Chicago's summary of McDougal's knowledge of its claims procedures makes no mention of McDougal using that information against Chicago. There is also no citation to the record after this sentence: "Mr. McDougal conceded, for the first time and just before Chicago demanded that he disqualify himself, that he was using information about Chicago's claims handling practices and internal structure obtained from his prior representation to frame Liberty's discovery requests and its 'bad faith' theory."

---

[2] "Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143–1144 [86 Cal.Rptr.2d 816, 980 P.2d 371].)

■ We look askance at this practice of stating what purport to be facts—and not unimportant facts—without support in the record. This is a violation of the rules, specifically rule 8.204(a)(1)(C) of the California Rules of Court, with the consequence that such assertions will, at a minimum, be disregarded. (*Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 827, fn. 1 [19 Cal.Rptr.3d 84].)

As we have noted, the record does contain the letter dated November 10, 2009, in which Chicago, through its new counsel, objected to McDougal's use of his knowledge of Chicago's claims practices. Allegedly, Chicago learned of this only during the "meet and confer" held a few days before the letter was written. But this is contradicted by McDougal's deposition, taken on September 3, 2008, when he stated: "I had taken and put all of my clients with Chicago Title Insurance Company because of my vast experience with their claims department." Thus, Chicago was on notice as of September 2008 of McDougal's "vast experience" with its claims department, which not unreasonably could mean that he was familiar with its claims policies and personnel. In any event, it was enough to put Chicago on inquiry notice, but there was no inquiry.

But even if it is true that Chicago only learned of McDougal's knowledge of its claims policies in the fall of 2009, there is absolutely nothing to suggest that this knowledge was in any way relevant. In the first place, McDougal's knowledge of the claims policies came to light only when he discovered, to his chagrin, that those policies had apparently *changed* after Chicago was acquired by Fidelity National in 2000. What McDougal knew was therefore literally history. Finally, as Chicago's letter of November 10, 2009, reflects, the discovery about Chicago's claims policies, directives, guidelines, personnel, etc., was, as might be expected, massive. Thus, it is very questionable that McDougal had anything to add when it came to Chicago's policies and practices.

■ In short, Chicago's attempt to start the clock ticking only in October/November 2009 is simply a failure. This brings us to the question whether a delay of two years is unreasonable. There are a number of factors to be taken into account in answering this question.

The stage of litigation at which the disqualification motion is made is one such consideration. (See generally Flamm, Lawyer Disqualification, *supra*, § 21.5, pp. 406–409.) Where in a marital dissolution action the case was remanded for further proceedings and one of the parties filed a motion seeking to disqualify the opponent's counsel, the court noted that to "deprive respondent of the counsel of his choice *at this late stage in the proceedings*, where no unfair disadvantage to appellant is indicated, would, we believe,

cause undue hardship to respondent without serving the purpose of the disqualification remedy." (*In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 565 [20 Cal.Rptr.2d 132], italics added.) It stands to reason that the later the motion is made, the more difficult it is to replace counsel. In this case, the motion was made roughly midway through the case, which is a very bad time to have to change lawyers, especially in a case that involves the interplay of many documents and several witnesses.

That this is not a simple case is yet another consideration. Title insurance litigation in a bad faith context is neither easy nor simple. It requires knowledge of both the law and practice of title insurance and not inconsiderable professional skills. Replacing counsel midway through such a case is a very dicey proposition, especially after the coverage phase of the trial.

■ Delay is significant not only from the perspective of prejudice to the nonmoving party, it is also an indication that the alleged breach of confidentiality was not seen as serious or substantial by the moving party. (E.g., *Glover v. Libman* (N.D.Ga. 1983) 578 F.Supp. 748, 767 [delay can be seen as an admission that confidentiality and conflict are not significantly at stake].) As we have seen, in his September 2008 deposition, McDougal spoke of his "vast experience" with Chicago's claims department; evidently, neither Chicago nor its counsel became alarmed over this. This strongly suggests that no one felt that McDougal's asserted familiarity with Chicago's claims procedures posed a problem. This is surely a strong indication that this disqualification motion should be denied.

■ It has also been held that one can properly consider the possibility that the "party brought the motion as a tactical device to delay litigation." (*Western Continental Operating Co. v. Natural Gas Co., supra*, 212 Cal.App.3d 752, 763.) This is a reasonable inference in this case. Chicago and its counsel were well aware of McDougal's exposure to Chicago's claims department from the very beginning; in fact, McDougal discussed it with Attorney Garcia at the outset of the case. This is why the claim rings hollow that McDougal's asserted knowledge of confidential information was allegedly discovered only in October/November 2009.

Finally, the showing that the delay was unreasonable was of such a character and weight that the burden shifted to Chicago to justify the delay. (*In re Complex Asbestos Litigation, supra*, 232 Cal.App.3d 572, 599.) Other than contending, unsuccessfully, that there was no delay at all, Chicago offered nothing to justify the delay.

■ Even though the test on appeal is abuse of discretion, we must carefully review the trial court's exercise of discretion. (*People ex rel. Dept. of*

*Corporations v. SpeeDee Oil Change Systems, Inc., supra,* 20 Cal.4th 1135, 1144.) As the foregoing discussion shows, there is sound reasoning behind the trial court's decision. The timing of the motion is among the most significant circumstances that was taken into consideration by the trial court. The timing spells prejudice to Liberty, as we discuss below, and it also reflects a lack of concern on Chicago's part over the alleged breach of confidentiality. On balance, we conclude that the trial court did not err in concluding that the delay in this case was unreasonable.

### 3. *The Prejudice to Liberty Was Extreme*

We agree with the trial court that the prejudice to Liberty would have been extreme if McDougal had been disqualified.

McDougal not only knew Liberty as a result of having represented it since 1993, he gained mastery of this case as it was being developed for the two years that preceded the trial of the first phase. All will agree that mastery over a complex case is best acquired as the case progresses through discovery. While it is of course possible to learn a case by reviewing the file, it is not quite the same as having done it as McDougal did it in this case. But this is not all there was. McDougal was not only Liberty's longtime lawyer and the man who filed and developed this case, he was *successful* with the case. That marked him as a lawyer of great value to Liberty (and quite possibly provided the motivation for the motion to disqualify him).

Among all the factors to be taken into account in a motion for disqualification, the interest and right of the nonmoving client to the lawyer of its choice is certainly one. This interest must of course yield to the moving party's interest when there is an actual conflict or breach of confidentiality. But when, as here, the delay was so unreasonable as to amount to an implied waiver, the interests of the nonmoving client should certainly be taken into account. And, in this case, that interest is very clearly a continuation of McDougal as counsel for Liberty.

Chicago's contention that there is no substantial evidence to support the finding of extreme prejudice is without merit. McDougal's long association with Liberty, his knowledge of this case and his success with the case, when viewed by an informed eye, is substantial evidence of his great value to Liberty. It follows that losing him would be a disastrous development for Liberty. After all, clients pursue cases in order to win them and that is what McDougal did for Liberty.

4. *McDougal Should Not Have Been Disqualified Because He Was Also a Witness*

Chicago contends that the trial court used the wrong standard in determining that McDougal's role as a witness did not disqualify him as Liberty's counsel. In addition to consent by the client, Chicago contends, the court should also have considered "detriment to the opponent or injury to the integrity of the judicial process." (*Lyle v. Superior Court* (1981) 122 Cal.App.3d 470, 482 [175 Cal.Rptr. 918].) The court's minute order makes no mention of detriment to Chicago or the integrity of the judicial process.

██ We cannot imagine that the seasoned trial judge in this case did not take into account the interests of justice in deciding whether McDougal's additional role as a witness disqualified him as Liberty's counsel. This consideration is an organic part of the decision to be made when a party's lawyer is proposed as a witness. Chicago provides no support at all for the claim that the trial judge did not take the interests of justice or, for that matter, Chicago's interests into account. Not every component of a trial court's decisionmaking process is to be found in the minute order containing the decision.

## DISPOSITION

The order is affirmed. Liberty is to recover its costs in this appeal.

Rubin, Acting P. J., and Grimes, J., concurred.