Filed 7/31/13

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| FIDUCIARY TRUST INTERNATIONAL OF CALIFORNIA,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>　　　　Respondent;<br><br>MICHAEL J. BROWN et al., as Trustees, etc.<br><br>　　　　Real Parties in Interest. | No. B247441<br><br>(Los Angeles County<br>(Super. Ct. No. SP001682) |

_____

ORIGINAL PROCEEDING. Petition for writ of mandate, Joseph S. Biderman, Judge. Writ granted.

Holland & Knight, Bruce S. Ross, Vivian L. Thoreen and Roger B. Coven for Petitioner.

No appearance for Respondent.

Sandler and Rosen, Charles L. Birke and Adam W. Guerrero for Real Parties in Interest.

_____

## INTRODUCTION

In 1992, Raymond Sandler, then an attorney at Sandler & Rosen, drafted wills for Willet Brown and his wife Betty Brown. Willet's will established a marital trust that was expected to generate several million dollars in annual income. The will named Betty as the marital trust's income beneficiary for life; upon her death, the principal of the trust was to be transferred into an Exemption Equivalent Trust that would benefit each of Willet's four children. Betty's will, in turn, left a large majority of her estate to the Exemption Equivalent Trust. After Willet died, Betty revoked the will that Sandler had prepared and drafted a new instrument transferring the large majority of her assets to a trust that was to benefit her daughter.

Following Betty's death in 2011, a dispute arose between her personal representative—petitioner Fiduciary Trust International of California—and the marital trust trustees regarding whether the terms of Willet's will required the trust to pay approximately $27 million in estate and inheritance taxes that were due on Betty's assets. Fiduciary Trust filed a motion to disqualify Sandler & Rosen, arguing that the firm was barred from representing the trustees based on Sandler's prior representation of Betty. The trial court denied the motion and Fiduciary now petitions this court for a writ of mandate compelling the court to vacate its ruling and enter a new order disqualifying Sandler & Rosen. We issued an order to show cause and we now grant the petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Browns' Estate Planning Documents*

Raymond Sandler, an attorney at Sandler & Rosen LLP, served as Willet H. Brown's personal, family and business attorney. In 1992, Sandler drafted a will for Willet, whose estate was then estimated to be worth $200 million, and a separate will for Willet's wife of 45 years, Betty Brown. At the time Sandler drafted the wills, Willet had four adult children: Kim Blake, who was his only child with Betty, and three children

2

from a prior marriage:  Michael J. Brown, Patricia Louise Brown and Peter Ransom Brown.

Willet's will bequeathed his personal effects and real property to Betty.  The remainder of his estate was to be divided between two trusts:  the "Exemption Equivalent Trust" and the "Marital Trust."  The Exemption Equivalent Trust was to be initially funded with "a pecuniary amount equal to the maximum sum" of various gift and estate tax exemptions then in effect, which totaled approximately $600,000.  The trust was to be divided into equal shares among Willet's four children.  Each child was to receive the income from their respective share of the trust for life; upon their death, the principal of each child's share was to go to his or her designated appointee.

The will placed all of Willet's remaining assets into the Marital Trust and named Betty as the income beneficiary of the trust for her life.  The will directed that, upon Betty's death, the trustees of the Marital Trust were to pay all "legally enforceable claims against her or her estate, expenses of administration and any estate or inheritance taxes payable by reason of her death, including interest and penalties, from either income or principal of the Marital Trust . . . unless other adequate provisions shall have been made therefore."  After such payments were made, the trustees were to distribute the remaining principal of the Martial Trust into the Exemption Equivalent Trust.

The separate will that Sandler drafted for Betty bequeathed various personal and real property to her daughter Kim.  The residue of Betty's estate was to go to the "'Trustees of the Exemption Equivalent Trust created under the Will of . . . [Willet Brown]."

In addition to the two wills, Sandler prepared a memo for Willet summarizing the terms of the estate planning documents.  The memo stated that Sandler expected Betty to receive approximately $3 million in annual income from the Marital Trust, which would enable her to "accumulate a sizeable amount during her lifetime."  The memo further explained that, under the terms of Betty's will, this accrued income "would go into the Exemption Equivalent Trust which . . . is for the benefit of all four of your children."  The memo also indicated that while there would be "no tax to pay under your present

3

Will," substantial federal estate and state inheritance taxes would become due upon Betty's death, which would be paid from the Marital Trust. After the payment of those taxes and any other debts, the remaining principal would be transferred to the Exemption Equivalent Trust and "divided into equal shares for each of your children . . ."

Betty signed her will in July of 1992 and Willet signed his will two months later. Willet died in October of 1993. Shortly thereafter, the Marital Trust and Equivalent Exemption Trust were established pursuant to an ex parte order appointing testamentary trustees.

After Willet died, Betty established the "Betty R. Brown Trust," which she amended on several occasions. The operative version of the trust acted to rescind Betty's 1992 will and directed that, upon her death, a significant majority of the trust assets (which consisted of Betty's personal effects, residences and income she had accumulated from the Marital Trust) were to be distributed to Kim outright. The Betty Brown Trust also included language indicating that the trustee should obtain all estate and inheritances taxes due on her estate from the trustees of the Marital Trust: "The terms of the Marital Trust established under the Will of [Betty's] late husband, [Willet Brown], . . . provide that upon [Betty's] death, the trustees of the Marital Trust shall pay . . . any estate or inheritance taxes payable by reason of [Betty's] death, . . . unless other adequate provisions shall have been made therefore. [Betty] has made no provision for the payment of any such claims expenses or taxes . . . To the extent that Trustee hereunder shall be required to pay any such claims or expenses, or any such taxes payable by reason of [Betty's] death, [Betty] directs the trustee to recover from the Marital Trust all such claims and expenses and all such taxes . . ."

Betty died on December 26, 2011. Fiduciary Trust International of California (Fiduciary) was appointed "administrator with will annexed" of Betty's estate and letters of administration were issued on November 6, 2012.

4

### B. *Dispute Regarding Payment of Taxes Owed on Assets Held in the Betty Brown Trust*

As a result of Betty's death, approximately $100 million in estate and inheritance taxes became due on the property in the Marital Trust and the Betty Brown Trust. Although the trustees of the Marital Trust agreed to pay the portion of the taxes attributable to property held within the Marital Trust (approximately $74 million), they refused to pay the portion of taxes attributable to assets within the Betty Brown Trust.

In August of 2012, Fiduciary filed a petition for an order confirming its right "to seek payment from the Trustees of the Marital Trust . . . [for] any and all claims, expenses or taxes arising from Betty's death, including the total federal estate tax liability attributable to the death of Betty Brown . . . of which the estimated remaining amount is approximately $27,000,000." Fiduciary argued that it was entitled to this payment because Willet's will specifically directed the trustees of the Marital Trust to pay "any estate or inheritance taxes payable by reason of [Betty's] death . . . unless other adequate provision have been made therefore." Fiduciary also argued that the Betty Brown Trust included specific language clarifying that Betty had made no other provisions for the payment of estate and inheritances taxes.

The trustees of the Marital Trust, who were represented by Sandler & Rosen, filed a cross petition seeking an order that it was only obligated to pay "estate and inheritances taxes, claims, and expenses attributable to property held by the Marital Trust" and had no further obligation to pay "taxes, claims, or expenses attributable to assets owned by the Betty Brown Trust." The trustees alleged that, during the 18 years between Willet and Betty's deaths, Betty had "accumulated more than $80 million in assets from the . . . income she received from the Marital Trust." The petition asserted that, under the terms of Betty's 1992 will, those assets would have been transferred to the Equivalent Exemption Trust upon her death, thereby benefitting each of Willet's four children. Following Willet's death, however, Betty had elected to revoke that will and established the Betty Brown Trust, which benefitted only Kim.

5

The Marital Trust trustees argued that, in light of the changes Betty made to her estate plan, it would be unfair to require the Marital Trust to pay the $27 million in estate taxes owed on the assets in the Betty Brown Trust: "[I]f the Betty Brown Trust prevails on its claim against the Marital Trust, then each of Willet's other three children, Patricia, Michael and Peter will pay approximately $6,750,000 in death taxes on property they will never receive. Each of their Exemption Equivalent Trusts will be reduced by that amount if the Marital Trust pays the $27,000,000 death taxes for the Betty R Brown Trust. . . Such a result was never intended, contemplated or understood by Willet when he signed his Will and when he died. At the time of his death, he had knowledge of Betty's will which bequeathed all her property, except personal property and the residences, to the Exemption Equivalent Trusts established by his Will for the benefit of his four children equally."

The trustees articulated three reasons why the Marital Trust should not be required to pay the taxes attributable to the Betty Brown Trust. First, they asserted payment of such taxes was "not permitted by Probate Code section 20110 and 20111," which require estate taxes to be equitably prorated in proportion to the value of the property received by each person interested in the estate unless there exists a clear and unambiguous direction to the contrary.[1] The trustees contended that the language in Willet's will requiring the Marital Trust to pay any taxes that became due upon Betty's death was not sufficiently clear in light of events that occurred after Willet's death.

---

[1]    Section 20110 states, in relevant part: "(a) Except as provided in subdivision (b), any estate tax shall be equitably prorated among the persons interested in the estate in the manner prescribed in this article. (b) This section does not apply: (1) To the extent the decedent in a written inter vivos or testamentary instrument disposing of property specifically directs that the property be applied to the satisfaction of an estate tax or that an estate tax be prorated to the property in the manner provided in the instrument. . .

Section 20111 states: "The proration required by this article shall be made in the proportion that the value of the property received by each person interested in the estate bears to the total value of all property received by all persons interested in the estate, subject to the provisions of this article."

6

Second, the trustees argued that Betty's decision to redirect the residuary of her estate from the Exemption Equivalent Trust to Kim constituted "other adequate provisions" for the payment of inheritance and estate taxes: "Betty Brown's revised estate plan represents a tremendous change of circumstances from that existing when Willet Brown signed his Will. Approximately $80,000,000 in Betty Browns' Residuary Estate are 'adequate provisions' for payment of the claims, expense, and death taxes attributable to the assets in the Betty R. Brown Trust in which the Marital Trust now has no interest."

Finally, the trustees argued that the court had equitable and statutory authority "to alter or modify the distributive provisions of [Willet's will] to accomplish [Willet's] actual intent at the time the instrument was executed." The trustees contended that the wills Sandler had drafted for Willet and Betty made clear that Willet only intended the Marital Trust to pay taxes on property that was to be transferred to the Equivalent Exemption Trust. Thus, according to the trustees, the court had authority to modify Willet's will to clarify that the trustees were only required to pay taxes applicable to assets within the Marital Trust.

### C. Fiduciary's Motion to Disqualify Sandler & Rosen

#### 1. Summary of Fiduciary's motion to disqualify

In December of 2012, Fiduciary filed a motion to disqualify Sandler & Rosen from representing the Marital Trust based on the firm's prior representation of Betty in 1992. Fiduciary contended that the subject of Sandler & Rosen's current representation was substantially related to the services it had provided to Betty in 1992, which consisted of drafting her will and advising her about her and Willet's estate plan. Fiduciary asserted that because Sandler & Rosen was attempting to undertake a representation adverse to a former client in a substantially related matter, it was automatically disqualified.

Fiduciary's attorney, Vivian Thoreen of Holland & Knight, filed a declaration in support of the motion explaining that she discovered Raymond Sandler had previously

7

represented Betty after reviewing a declaration that Charles Birke, an attorney at Sandler & Rosen, had filed in a related proceeding in October of 2012. Birke's declaration included the following statement: "Mr. Sandler was the personal attorney of Willet H Brown. Over the years before Mr. Brown's death in 1993, Mr. Sandler advised Mr. Brown on estate planning matters, including drafting wills from time to time for Mr. Brown. He also drafted a will for Mr. Brown's wife, Betty Brown and communicated with her concerning her will. [¶] . . . [T]he files maintained by Mr. Sandler . . . contained written communications with Willet H. Brown and Betty Brown, regarding their estate plans, drafts, and final wills signed by Willet H. Brown and Betty Brown." Sandler & Rosen had also produced to Holland & Knight an executed copy of Betty's 1992 will and a letter Sandler had written to Betty stating: "a draft of the Will that I have prepared in accord with our recent meeting [is enclosed]."

The trustees opposed the motion to disqualify, arguing that the rule precluding an attorney from undertaking a representation adverse to a former client was predicated on the duty of confidentiality. The trustees further asserted that because Sandler & Rosen had jointly represented Willet and Betty Brown in the 1992 estate planning matters, it owed no duty of confidentiality on any matter of dispute between them relating to that prior representation. In support of its position, the trustees cited Evidence Code section 952, which provides an exception to the attorney-client privilege for communications made in the course of a joint representation in proceedings between the joint clients.

The trustees also asserted that although California courts generally utilize the "substantial relationship test" to assess disqualification motions predicated on successive adverse representations, the test did not apply in the context of joint representations. According to the trustees, under such circumstances, the party moving to disqualify must establish that it would be "unfairly disadvantaged by use of any confidential information," thereby undermining "the integrity of the judicial process. . ."

Finally, the trustees argued that Betty had waived her right to disqualify Sandler & Rosen by failing to object to the firm's representation of the trustees in several prior proceedings between the parties. A declaration from Charles Birke stated that Betty

8

Brown, acting through independent counsel, had litigated multiple prior disputes against the Marital Trust and had never sought Sadler & Rosen's disqualification in any of those matters. According to the trustees, "Betty's failure to move to disqualify [Sandler & Rosen] for more than 16 years, despite several adversarial proceedings, proves that Betty consented to [Sandler & Rosen's] continued representation of the Trustees of the Marital Trust." The trustees also argued that, in the current action, Fiduciary's attorney, Holland & Knight, had learned of Sandler's prior representation of Betty more than two months before moving for disqualification.

### 2. *Hearing on the motion to disqualify*

At the hearing on the motion to disqualify, the trial court stated that, under the substantial relationship test, it was required to determine "whether the evidence . . . in the [moving] papers support[s] a rational conclusion that information material to the . . . former representation . . . would be material to the current representation." The court explained that the primary issue in the current dispute was whether Betty had made any "other adequate provisions" for the payment of her estate and inheritance taxes within the meaning of Willet's will. The court further explained that, in its view, there was little likelihood that any confidential communication between Betty and Sandler would be relevant to that issue: "[T]he trouble that I'm having here is that either Betty Brown did or did not make other adequate provisions. I mean, that's going to be the issue at trial. Is that necessarily going to be determined, or can it be determined without the resort to confidential communications being revealed between Betsy Brown and Mr. Sandler and Mr. Sandler's office back in 1992."

The court also expressed concern that while Fiduciary had provided documents showing Betsy and Sandler had shared communications regarding the 1992 estate planning matters, it had not identified any evidence suggesting that they had discussed the "other adequate provisions" clause: "[W]ithout [evidence] showing [Betty and Sandler discussed the "other adequate provisions" clause], I don't know that I can conclude that there's even any possibility of confidential communications. . . . I don't

9

know that we're at the point, factually, that I can conclude there's any possibility of confidential information necessarily being involved that should mandate the disqualification of Sandler & Rosen."

In response, Fiduciary argued that it was irrelevant whether Betty and Sandler had actually exchanged confidential communications related to the current proceeding; the proper inquiry was only whether a substantial relationship existed between Sandler & Rosen's former representation of Betty and its current, adverse representation of the Marital Trust. Fiduciary further asserted that Sandler could have easily avoided a disqualifying conflict by obtaining Betty's consent to their subsequent representation of Willet in the event a dispute arose between her and Willet regarding their estate plan. Fiduciary's attorney explained that "[a]fter that representation is over–which in this case occurred in 1992–Sandler & Rosen, not having gotten informed written consent so far as we know, cannot represent the husband versus the wife or vice versa in any matter having to do with the estate plan."

The court, however, reiterated its view that any communications that occurred in 1992 were unlikely to be used in the current dispute: "Is there really anything that transpired during the representation back in 1992 that Sandler & Rosen could ever possibly come in . . . because we have a document that speaks for itself. . . . And what we're going to be looking at is not what happened in '92, because there's nothing else there but the instruments. We're going to be looking over the many years past did Betty Brown do anything to address the payment of estate taxes. I don't see how anything that transpired with Sandler & Rosen could in any way be entertained by the court or introduced in court . . ." The court also noted that Sandler, Betty and Willet had all died during the 20 years that had passed since the prior representation, thereby reducing the likelihood that Sandler & Rosen was in possession of any confidential communications related to the current dispute: "[T]hat's the interesting . . . . part about this case, that there is no one alive, there is nothing in writing, there is no possibility, and yet you're seeking to disqualify . . .."

10

The trustees, on the other hand, did not address whether Fiduciary had shown that a substantial relationship existed between the current and antecedent representations. Instead, it argued–as it had in its briefs–that disqualification was unnecessary because "there was never any confidentiality in this case. This was . . . a joint estate plan, joint client. The evidence code . . . is absolutely clear that there is no confidentiality between joint clients in a dispute between the joint clients." The trustees further asserted that, under *Zador Corporation v. Kwan* (1995) 31 Cal.App.4th 1285 (*Zador*), "the 'substantial relationship' test doesn't even apply in the joint case. Now *Zador* went on to say in that case there was . . . informed consent. But your honor, in this case . . . there was no rule in effect about informed consent on conflicts when Sandler did this work. The rule that [Fiduciary is] citing became effective September the 14th, 1992."

At the conclusion of the hearing, the court took the matter under submission. On February 5, 2013, it denied the motion. Fiduciary subsequently filed the instant writ petition seeking relief from the court's ruling. We issued an order to show cause why the trial court should not be compelled to vacate its ruling and issue a new order granting the motion to disqualify.[2]

## DISCUSSION

### A. Standard of Review

"'Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.]' [Citation.] As to disputed factual issues, a reviewing

---

**2**      A trial court's ruling on a disqualification motion is a proper subject for a petition for writ of mandate: "'If the trial court denies a motion to disqualify counsel, the unsuccessful moving party can seek immediate appellate review, either by petitioning the reviewing court for a writ of mandamus, asserting that the remedy by appeal is not adequate . . . or by filing a notice of appeal from the order denying disqualification. . . . [¶] . . . A petition for extraordinary relief on the merits accompanied by a request for an immediate stay is preferable, because generally extraordinary writs are determined more speedily than appeals. The specter of disqualification of counsel should not be allowed to hover over the proceedings for an extended period of time for an appeal.' [Citation.]" (*Apple Computer, Inc. v. Superior Court* (2005) 126 Cal.App.4th 1253, 1263-1264.)

11

court's role is simply to determine whether substantial evidence supports the trial court's findings of fact; 'the reviewing court should not substitute its judgment for . . . express or implied [factual] findings [that are] supported by substantial evidence.  [Citations.]' [Citation.]  As to the trial court's conclusions of law, however, review is de novo; a disposition that rests on an error of law constitutes an abuse of discretion.  [Citations.] The trial court's 'application of the law to the facts is reversible only if arbitrary and capricious.'  [Citation.]"  (*In re Charlisse C*. (2008) 45 Cal.4th 145, 159 (*Charlisse C*.).)

## B. The Rules Governing Disqualification of an Attorney Proceeding Against a Former Client

A motion to disqualify counsel places a litigant's right to select his or her attorney into conflict with the duty to maintain ethical standards of professional responsibility. (*Jessen v. Hartford Casualty Insurance Company* (2003) 111 Cal.App.4th 698, 705 (*Jessen*).)  In determining whether a conflict of interest requires disqualification, however, the trial must look beyond "the interests of the parties."  (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems* (1999) 20 Cal.4th 1135, 1145 (*SpeeDee Oil*).)  "The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar.  The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process.  [Citations.]"  (*Ibid*.)

"Protecting the confidentiality of communications between attorney and client is fundamental to our legal system. . . . [It is] a basic obligation of every attorney . . . [t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.'  (Bus. & Prof. Code, § 6068, subd. (e).)"  (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1146.)  To protect the attorney-client relationship's confidentiality, the Rules of Professional Conduct provide that an attorney "shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former

client, the member has obtained confidential information material to the employment." (Rules Prof. Conduct, rule 3–310(E).)

A disqualifying conflict of interest generally arises under Rule 3–310(E) in two situations: "(1) in cases of successive representation, where an attorney seeks to represent a client with interests that are potentially adverse to a former client of the attorney; and (2) in cases of simultaneous representation, where an attorney seeks to represent in a single action multiple parties with potentially adverse interests." (*In re Charlisse C.,* 45 Cal.4th at p. 159.) Where, as here, the potential conflict "is one that arises from the successive representation of clients with potentially adverse interests, . . . the governing test requires that the client demonstrate a 'substantial relationship' between the subjects of the antecedent and current representations." (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283 (*Flatt*.)

Our courts have recognized two different versions of this test, depending on whether the attorney's representation of the former client was "direct and personal" or "peripheral [and] attenuated." (*Jessen, supra,* 111 Cal.App.4th at pp. 710-711; see also *City and County of San Francisco v. Cobra Solutions, Inc*. (2006) 38 Cal.4th 839, 847 (*Cobra*).) If the representation was "direct–that is, where the lawyer was personally involved in providing legal advice and services to the former client–" (*Jessen, supra*, 11 Cal.App.4th at p. 709) the only question is whether there is a substantial relationship between the subject of the prior representation and the subject of the current representation. If the answer is yes, "access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is presumed and disqualification of the attorney's representation of the second client is mandatory[.]" [Citations.]" (*Flatt, supra*, 9 Cal.4th at p. 283; see also *Cobra, supra*, 38 Cal.4th at p. 847; *Jessen, supra*, 111 Cal.App.4th at pp. 706, 709-710.)

A "modified version of the substantial relationship test [applies] in situations where the former attorney-client relationship was peripheral or attenuated, rather than direct and personal." (*Med–Trans Corp., Inc. v. City of California City* (2007) 156 Cal.App.4th 655, 664-666 (*Med-Trans*).) In such cases, the court will not presume the

13

attorney received confidential information absent a showing "the attorney was in a position vis-à-vis the client to likely have acquired confidential information material to the current representation." (*Jessen, supra*, 111 Cal.App.4th at p. 710; see also *Cobra Solutions, supra*, at 38 Cal.4th at p. 847.)

### C. The Trial Court Erred in Denying the Disqualification Motion

#### 1. The parties do not dispute that a substantial relationship exists between the prior and current representations

The trustees do not dispute that Sandler & Rosen's prior representation of Betty was direct in nature and substantially related to the current tax dispute. These apparent concessions are well-taken. There is no question that Sandler's representation of Betty was "direct" rather than "peripheral." The undisputed evidence shows that, in 1992, Sandler personally provided estate planning legal services to Betty and Willet.[3]

It is equally clear that there is a substantial relationship between the subject of Sandler & Rosen's representation of Betty and the subject of its representation of the Marital Trust. ""[A] "substantial relationship" exists whenever the "subjects" of the prior and the current representations are linked in some rational manner. [Citation.]' [Citation.]" (*Knight v. Ferguson* (2007) 149 Cal.App.4th 1207, 1213.) "Thus, successive representations will be 'substantially related' when the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues." (*Jessen, supra,* 111 Cal.App.4th at p. 712.)

---

**3** The parties also do not dispute that any conflict from this direct relationship is properly imputed to Sandler & Rosen as a whole. (See *Cobra, supra*, 38 Cal.4th at pp. 847-848 ["Normally, an attorney's conflict is imputed to the law firm as a whole on the rationale 'that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information.' [Citation.]"].)

14

The evidence produced at the trial court proceedings demonstrates that Sandler initially represented both Betty and Willet regarding their estate plans. In that role, Sandler drafted Willet and Betty's wills and had communications with them regarding these instruments. It is rational to conclude that, during the course of the representation, Sandler would have explained to Betty the meaning and effect of the significant terms of the wills, including the clause directing that all taxes due upon her death would be paid from the Marital Trust unless "other adequate provisions shall have been made therefore." Indeed, it is rational to assume Betty would have had a particular interest in the meaning of this provision given the significant estate and inheritance taxes that were expected upon her death. The particular meaning and intent of that clause, in turn, is at the very heart of the current dispute. Thus, the subjects of Sandler & Rosen's former representation of Betty and its current representation of the Marital Trust are not only substantially related, but involve the same subject matter: the intended meaning of the provision delineating the payment of estate taxes. While Sandler & Rosen initially represented both Betty and Willet, they have now chosen to continue to represent only Willet, through the Marital Trust, taking a position adverse to Betty.

The trial court's minute order does not explain why it denied Fiduciary's motion for disqualification. During the motion hearing, however, the court repeatedly stated that, in its view, there was little likelihood that Sandler and Betty had actually shared any information that would be relevant to the current dispute or that Sandler had passed any such information onto the surviving members of his firm. The court also noted that Fiduciary had not provided any evidence that Sandler and Betty discussed the "other adequate provisions" clause. Based on these comments–which are the only insights we have into the court's reasoning–it appears that, rather than merely assessing whether the prior and current representations were substantially related, the court inquired as to whether Sandler had actually obtained, or was otherwise in a position to obtain, any confidential information that other members of his firm might be able to use in the current proceeding.

Arguably, such an inquiry might have been proper if Sandler's attorney-client relationship with Betty had been peripheral or attenuated. The case law makes clear however, that such an inquiry is not permitted where, as here, the attorney-client relationship was direct: "[W]here the lawyer was personally involved in providing legal advice and services to the former client . . . it must be presumed that confidential information has passed to the attorney and there cannot be any delving into the specifics of the communications between the attorney and the former client in an effort to show that the attorney did or did not receive confidential information during the course of that relationship." (*Jessen*, *supra*, 111 Cal.App.4th at p. 709; see *also Brand v. 20th Century Ins. Co./21st Century Ins. Co*. (2004) 124 Cal.App.4th 594, 607 [disqualification required despite a "12 year passage between the two engagements" and the absence of any evidence demonstrating "confidential information [had actually been] obtained"].)

### 2. *The trustees have failed to identify any reason why disqualification is not required under the circumstances of this case*

Although the trustees do not dispute that a substantial relationship exists between Sandler & Rosen's representation of Betty and its current representation of the Marital Trust, they argue that disqualification is not required because: (1) Sandler & Rosen jointly represented Betty and Willet in the estate planning matters; and (2) Betty and Fiduciary waived any right to disqualification through unreasonable delay.

### a. *The joint nature of Sandler & Rosen's prior representation of Betty and Willet is insufficient to avoid disqualification*

The trustees initially contend that the rule prohibiting an attorney from successively representing clients with adverse interests does not apply where the attorney jointly represented the parties in the prior matter. In support of its position, the trustees rely on both statutory and decisional authority.

16

*i. Evidence Code section 962 does not establish a blanket exception to the ethical limitations on adverse, successive representations*

The trustees first argue that the prohibition on successive, adverse representations does not apply when the attorney jointly represented the parties in the prior matter because, under Evidence Code section 962, any attorney-client communications made during the course of that joint representation are not privileged as between the joint clients. Evidence Code section 962 "set[s] forth a joint client exception to the evidentiary privilege accorded to attorney-client communications." (*Western Continental Operating Company v. Natural Gas Corporation of California* (1989) 212 Cal.App.3d 752, 761 (*Western Continental*).) The exception provides that when ""two or more clients have retained or consulted a lawyer upon a matter of common interest" . . . . neither may claim the privilege in an action by one against the other. [Citations.]' [Citation.]"[4] (*Zador, supra,* 31 Cal.App.4th at p. 1294.) The trustees contend that because the bar on successive, adverse representations is predicated on the duty of confidentiality, it does not apply where the prior representation was governed by section 962.

The trustees' argument finds support in *Croce v. Superior Court of City and County of San Francisco* (1937) 21 Cal.App.2d 18 (*Croce*), which held that an attorney who had previously represented several clients associated in a business enterprise was not disqualified from representing one of those former clients in a related, subsequent litigation instituted against the other former clients. The appellate court explained that, under the joint-client exception to the attorney-client privilege, "communications made by parties united in a common interest to their joint or common counsel, while privileged against strangers, are not privileged as between such parties nor as between their counsel

---

[4]     The section states: "Where two or more clients have retained or consulted a lawyer upon a matter of common interest, none of them, nor the successor in interest of any of them, may claim a privilege under this article as to a communication made in the course of that relationship when such communication is offered in a civil proceeding between one of such clients (or his successor in interest) and another of such clients (or his successor in interest)."

and any of them, when later they assume adverse positions." (*Id*. at p. 20.) Thus, according to the court, the attorney was not prohibited from using confidential information obtained in the first representation against his former clients in the second representation.

Several courts have rejected *Croce*'s implication that Evidence Code section 962 creates a blanket exception to the prohibition on adverse, successive representations in cases where the attorney jointly represented the parties in the prior matter. (See *Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 623 ["Even if *Croce* were applicable, we would have difficulty following it. . . . 'The rule of *Croce* has not been followed in any other state, and several more recent cases suggest that its rule may no longer be followed in California'"].) For example, in *Industrial Indemnity Co. v. Great American Ins. Co.* (1977) 73 Cal.App.3d 529, 536 (*Industrial*), an insured who had been previously represented by an attorney retained by its insurer moved to disqualify the attorney from representing the insurer in a subsequent, related matter. The insurer opposed the motion, arguing that under Evidence Code section 962 and *Croce*, "since the [insured] and [insurer] were 'united in a common interest' in the defense of the [original] action, communications to their common counsel [were] not privileged." (*Id*. at p. 535.)

The appellate court rejected the argument: "The . . . viability of *Croce* has been questioned. [Citation.] Nevertheless, even if *Croce* is still good law, it is inapplicable. Minimally it presupposes that the former representation of two or more clients 'united in a common interest' [Citation] was not, itself, a violation of the Rules of Professional Conduct." (*Industrial, supra*, 73 Cal.App.3d at p. 536.) The court explained that, during the prior representation, the attorney had failed to disclose that a potential conflict existed between the insurer and the insured, who would not be indemnified in the event the injury occurred as the result of the its own negligence. The court concluded that, "even if *Croce* [wa]s still good law, it d[id] not apply to a situation where the joint representation of two or more clients with conflicting interests was undertaken or continued without disclosure and written consent." (*Id*. at p. 4.)

18

Similarly, in *Cornish v. Superior Court* (1989) 209 Cal.App.3d 467 (*Cornish*), the court held that the determination whether an attorney may represent one former joint client against another in a subsequent, related matter depends on the individual facts of each case. *Cornish* involved a dispute between a contractor and its subcontractor arising from a construction project. Several lawsuits were filed regarding the project, and the contractor, acting through his independent counsel, agreed to tender defense of several of the actions to the subcontractor's bond company, Capital. Prior to accepting the defense tender, Capital's attorney obtained the contractor's consent that if Capital and the contractor became "adversaries in a future litigation," the attorney could continued to represent Capital regardless of any conflict with the contractor. Moreover, at all times during the defense, the contractor retained personal counsel to advise him and there was no evidence that Capital's attorney ever provided advice directly to the contractor. In a subsequent related action, Capital, using the same attorney, sued the contractor, who then moved for the attorney's disqualification.

The appellate court ruled that, under such circumstances, disqualification was not required. The court cited *Croce* in support of its holding, but rejected the apparent breadth of its holding: "[A]n attorney should not always be free to represent one former joint client against another merely because of the joint-client exception to the attorney-client privilege and we can easily envision situations where such action would seriously undermine the integrity of the attorney-client relationship, the present case is not such a situation." (*Cornish, supra,* 209 Cal.App.3d at p. 477.) The court noted that, in the case before it, the contractor maintained an attorney-client relationship with his personal attorney, who he had looked to "not only to advise him but to represent his interests [in the litigation]." (*Ibid.*) It further noted that Capital's attorney had informed the contractor that it intended to continue to represent Capital in the event a conflict developed between the parties. The court explained that its "conclusion [wa]s based on the specific facts present" and "would be significantly altered if petitioner had not been independently represented by counsel or if there was evidence that petitioner looked to

19

both its personal counsel and [Capital's attorney] for advice and counsel." (*Id*. at pp. 477-478.)

Finally, in *Western Continental, supra,* 212 Cal.App.3d 752, the court rejected outright *Croce's* conclusion that the joint-client exception to the attorney-client privilege had any relevance to the issue of disqualification. The plaintiff in *Western Continental* jointly litigated a claim with the Natural Gas Corporation of California (NGC) against a third party. Years later, plaintiff, utilizing the same attorney, filed a breach of contract action against NGC, which then moved to disqualify plaintiff's attorney. The trial court concluded that the matters were substantially related and granted the motion.

On appeal, plaintiff argued that the ethical rules applicable to successive representations "did not apply where the attorney jointly represented the parties in the former matter." (*Western Continental, supra,* 212 Cal.App.3d at p. 761.) Plaintiff asserted that, pursuant to Evidence Code section 962, "each party fully understood that information disclosed by either party [during the joint representation] should be shared with both parties." (*Ibid.*) As a result, the attorney was permitted to disclose to plaintiff any information NGC had provided during the course of the joint representation.

In rejecting this argument, the court adopted the reasoning set forth in prior federal decision that had rejected *Croce*: "We disagree that the privilege exception [in Evidence Code section 962] . . . ha[s] any application here. . . . [W]e are not concerned in this case with discovery of allegedly privileged communications. Instead, the pertinent issue is the propriety of an attorney's representation adverse to a former client. Our courts have distinguished the rule against representing conflicting interests from the attorney-client evidentiary privilege noting that the former is broader than the latter. ''' . . . The evidentiary privilege and the ethical duty not to disclose confidences both arise from the need to encourage clients to disclose all possibly pertinent information to their attorneys, and both protect only the confidential information disclosed. The duty not to represent conflicting interests . . . is an outgrowth of the attorney-client relationship itself, which is confidential, or fiduciary, in a broader sense. Not only do clients at times disclose confidential information to their attorneys; they also repose confidence in them. The

20

privilege is bottomed only on the first of these attributes, the conflicting-interests rule, on both.' [Citation.]' [Citation.]" (*Western Continental, supra*, 212 Cal.App.3d at p. 762 [citing and quoting *E. F. Hutton & Company v. Brown* (S.D. Tex. 1969) 305 F.Supp. 371, 393-394 ["What the court in *Croce* failed to note is that the basis for the rule against representing conflicting interests is broader than the basis for the attorney-client evidentiary privilege"].)

We agree with *Western Continental's* reasoning and follow its holding here. In explaining the standard for evaluating whether representation adverse to the interests of a former client is prohibited, the California Supreme Court has "broadly . . . explained that 'an attorney is forbidden to do either of two things after severing his relationship with a former client. He may not do anything which will injuriously affect his former client in any matter in which he formerly represented him nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship.' [Citation.] The prohibition is in the disjunctive. An attorney 'may not use information *or* "do anything which will injuriously affect his [or her] former client."' [Citation.]" (*City National Bank v. Adams* (2002) 96 Cal.App.4th 315, 323-324 [citing and quoting *Wutchumna Water Co. v. Bailey* (1932) 216 Cal. 564, 573-574 and *People ex rel. Deukmejian v. Brown* (1981) 29 Cal.3d 150, 156] [footnote omitted].) In this case, Sandler & Rosen's conduct falls squarely within the prohibition. Although the firm previously represented both Betty and Willet in the estate planning matters, it is now asserting (on behalf of Willet's representatives) that the documents it prepared during the joint representation should be interpreted in a manner that would substantially reduce the value of Betty's estate (or her trust), thereby harming her interests.

The California Supreme Court has also repeatedly held that the disqualification rules are not merely intended to protect client confidences or "other interests of the parties"; rather, "[t]he paramount concern . . . [is] to preserve public trust in the scrupulous administration of justice and the integrity of the bar." (*Speedee Oil, supra,* 20

21

Cal.4th at p. 1145.) In light of these significant public interests, we do not agree that matters of disqualification should be determined solely by reference to evidentiary rules.[5]

Moreover, even if, as *Cornish* indicates, there may be some circumstances under which an attorney may represent one former joint client against another in a substantially related matter, this is not such a case. None of the factors underlying the court's decision in *Cornish* are present here: Sandler & Rosen directly and personally advised Betty on the estate planning matters; there is no evidence that Betty retained independent counsel to advise her; and, as discussed in more detail below, there is no evidence Sandler & Rosen disclosed to Betty the adverse aspects of the joint representation nor did it obtain her consent that, if a conflict arose, Sandler & Rosen could continue to represent Willet.

### ii. *Zador v. Kwan supports disqualification*

The trustees next contend that, under *Zador v. Kwan, supra*, 31 Cal.App.4th 1285, courts should not use the substantial relationship test to assess disqualification motions predicated on successive representations if the attorney jointly represented the parties in the prior proceeding. According to the trustees, *Zador* held that, under such circumstances, the only relevant inquiry is whether the attorney complied with the Rules of Professional Conduct governing disclosure of conflicts that were in effect at the time of the prior joint representation. The trustees further assert that when Sandler jointly represented Betty and Willet in 1992, there was no ethical rule requiring him to disclose the potential conflicts inherent in the joint representation or to obtain Betty's consent before proceeding with the representation. As we explain, even if we accept the trustees' interpretation of *Zador*, there is no basis for their assertion that the Rules of Professional Conduct in effect in 1992 did not require Sandler & Rosen to obtain Betty's consent prior to jointly representing her and Willet in the estate matters.

---

[5] For the same reasons, we reject the trustees' assertion that Evidence Code sections 957 and 960, which set forth additional attorney-client exceptions for communications by a deceased client regarding the client's intent with regard to a conveyance, are relevant to determining the issue of disqualification.

The plaintiff In *Zador*–the Zador Corporation– purchased a property through its agent C.K. Kwan. Zador subsequently sold the property through a partnership owned by James Claitor and Roy Bolton. Bolton later filed a lawsuit against Zador, Kwan and Claitor arising from the sale. After Zador retained Heller, Ehrman, White & McAuliffe (Heller) to defend it in the matter, Kwan requested indemnity based on his status as Zador's agent. Heller agreed to jointly represent Kwan and presented him with a conflict waiver indicating that, in the event a conflict arose between Zador and Kwan, Heller would discontinue its representation of Kwan and continue its representation of Zador. Kwan reviewed the waiver and signed it. At some point in the litigation, Heller discovered Kwan may have committed fraud against Zador in the initial purchase transaction and immediately advised him that he needed to retain separate counsel. Kwan agreed and reaffirmed his consent to Heller's continued representation of Zador. Zador later filed a cross-claim against Kwan, who then moved to disqualify Heller. The trial court "ruled that there was a substantial relationship between Heller's prior representation of Kwan and the current litigation. Accordingly, the motion to disqualify was granted." (*Zador, supra*, 31 Cal.App.4th at p. 1292.)

The appellate court reversed, concluding that, under the circumstances, the substantial relationship test was insufficient to determine whether disqualification was required: "[Generally,] if there is a substantial relationship between the pending suit and the prior representation, then such disclosure is presumed. At this point, disqualification is justified. [¶] However, when the prior representation involves joint clients, and the subsequent action relates to the same matter, the substantial relationship test adds nothing to disqualification analysis. This is because a substantial relationship between the former representation and the subsequent action is inherent in such situations. In other words, clients A and B are jointly represented by C until C discovers a conflict between the legal position of A and B. Client B retains separate counsel. Client A then sues Client B. In these circumstances, a substantial relationship will always exist between C's prior representation of B and the litigation between A and B. Accordingly, in this situation, the substantial relationship test does not 'test' anything. It should not determine whether C

23

should be disqualified from representing A." (*Zador, supra*, 31 Cal.App.4th at p. 1294.) The court further noted that although the substantial relationship test was devised as a means of determining when "confidences were likely disclosed, in a joint client situation, confidences are necessarily disclosed." (*Ibid*.)

The court concluded that because the substantial relationship test would always be satisfied where the prior action involved joint clients and the subsequent action related to the same matter, the "propriety of disqualification" in such cases should "generally turn[] upon the scope of the clients' consent." (*Zador, supra*, 31 Cal.App.4th at pp. 1294-1295.) The court explained that "[n]ot all conflicts of interest require disqualification. In some situations, the attorney may still represent the client if the client's consent is obtained. . . . [¶] For example, informed written consent is required before an attorney can jointly represent clients in the same matter. California Rules of Professional Conduct, Rule 3–310(C)(1) requires an attorney to obtain each client's informed written consent before accepting representation of more than one client in a matter in which the interests of the clients potentially conflict. Similarly, Rule 3–310(C)(2) requires an attorney to obtain each client's informed written consent before accepting or continuing representation of more than one client in a matter in which the interests of the clients actually conflict." (*Id*. at p. 1296.)

*Zador* reviewed several cases (including *Cornish*) in which courts had held that disqualification was not required if, prior to the joint representation, the attorney obtained written consent that it could represent one of the clients against the other in any future, related proceedings. It further concluded that the consent form Heller provided to Kwan was sufficiently detailed and that Kwan's consent was informed. In summarizing its ruling, the *Zador* court explained that the "[substantial relationship] test was not determinative . . . [b]ecause Kwan consented to Heller's continued representation of *Zador . . .*" (*Zador, supra*, 31 Cal.App.4th at p. 1303.)

It is not clear whether (as trustees contend) *Zador* held that the substantial relationship test does not apply when the attorney seeks to represent one former joint client against another in a matter related to the prior joint representation. An alternative

24

reading of the case is that the substantial relationship is always satisfied in such cases and, as a result, disqualification is required unless the attorney obtained consent. Stated more simply, *Zador* might be properly interpreted as a straightforward application of the rule that "if the prior representation was 'substantially related' to the current representation[,] . . . disqualification is unnecessary '"where the client expressly or impliedly consents to the adverse representation [citation]."' [Citations.]" (*In re Lee G.* (1991) 1 Cal.App.4th 17, 27.) In any event, the essential holding of *Zador* is that, when an attorney undertakes a representation of one former joint client against another in substantially related matter, disqualification motions should be evaluated based on whether the attorney complied with ethical disclosure and consent rules applicable to multiple party representations.

At the hearing on Fiduciary's disqualification motion, the trustees' contended that because Rule 3-310, subdivision (C)(1)–which requires an attorney to obtain consent before representing more than one client in a matter in which the interests of the clients potentially conflict–was not in effect at the time Sandler provided the estate planning services to Betty and Willet, Sandler had no duty to disclose the potential conflict to Betty or obtain her consent prior to proceeding with the joint representation.

While it is true that Rule 3-310, subdivision (C)(1) was not adopted until August in 1992 (several months after Betty signed the will that Sandler drafted for her), the prior version of the Rule 3-310, adopted in 1989, imposed identical duties. The prior version of rule 3-310, subdivision (A) states: "If a member has or had a relations with another party interested in the representation, or in its subject matter, the member shall not accept or continue representation without all affected clients' informed written consent."

The Drafter's Notes to former Rule 3-330 subdivision (A) explain: "Paragraph (A) is intended to apply to all types of legal employment, including the representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship. Examples of the latter include the formation of a partnership for several partners or a corporation for several shareholders, the preparation of an anti-nuptial agreement, or joint or reciprocal wills for a husband and wife . . . In such

25

situations, for the sake of convenience or economy, the parties may well prefer to employ a single counsel, but a member must disclose the potential adverse aspects of such multiple representation (e.g., Evid. Code, § 962) and must obtain the consent of the clients thereto. Moreover, if the potential adversity should become actual, the member must obtain the further informed written consent of the clients pursuant to subparagraph (B)."[6] The Drafter's Notes to the current version of Rule 3-330 include an almost verbatim explanation regarding subdivisions (C)(1) and (C)(2).[7]

The Drafter's Notes to the prior version of Rule 3-310, subdivision (A) specifically list the preparation of "joint or reciprocal wills for a husband and wife" as a form of multiple party representation that has "adverse aspects" and requires written consent. As a result, there is no basis for the trustees' assertion that the rules in effect at the time of Sandler's 1992 representation did not require him to obtain Betty's written consent before jointly representing her and Willet in the estate planning matters. The trustees have never presented any evidence that Sandler complied with this requirement. Accordingly, under the principles articulated in *Zador*, disqualification is proper here.

---

[6] The former version of Rule 3-310, subdivision (B) stated: "A member shall not concurrently represent clients whose interests conflict, except with their informed written consent." Similar requirements are now imposed under Rule 3-310, subdivision (C)(2), which provides that an attorney shall not, without the informed written consent of each client, "Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict."

[7] The notes state: "Subparagraphs (C)(1) and (C)(2) are intended to apply to all types of legal employment, including the concurrent representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship. Examples of the latter include . . . the preparation of . . . joint or reciprocal wills for a husband and wife . . . . In such situations, for the sake of convenience or economy, the parties may well prefer to employ a single counsel, but a member must disclose the potential adverse aspects of such multiple representation (e.g., [Evid. Code,] § 962) and must obtain the informed written consent of the clients thereto pursuant to subparagraph (C)(1). Moreover, if the potential adversity should become actual, the member must obtain the further informed written consent of the clients pursuant to subparagraph (C)(2)."

### D. The Trustees Failed to Make a Prima Facie Showing that Betty Waived her Right to Seek Disqualification

Finally, the trustees argue that, even if the substantial relationship would otherwise require disqualification under the circumstances of this case, Betty Brown and Fiduciary have waived any right to disqualification based on their unreasonable delay in seeking such relief. In the trial court proceedings, the trustees submitted a declaration from Sandler & Rosen indicating that: (1) prior to her death, Betty litigated multiple disputes against the Marital Trust; and (2) in each of those cases, Marital Trust was represented by Sandler & Rosen and Betty never moved for disqualification. The trustees further asserted, that in the current action, Fiduciary discovered Sandler & Rosen's 1992 representation of Betty more than two months before filing its motion for disqualification.

"[A]ttorney disqualification can be impliedly waived by failing to bring the motion in a timely manner." (*Liberty Nat. Enterprises, L.P. v. Chicago Title Ins. Co*. (2011) 194 Cal.App.4th 839, 845 (*Liberty*).) As explained by one court, "it is not in the interests of justice to make the 'substantial relationship' rule so unyielding as to permit the former client to inexcusably postpone objections without penalty. Therefore, a narrow exception should apply if the present client, by way of opposition, offers prima facie evidence of an unreasonable delay by the former client in making the motion and resulting prejudice to the current client." (*River West, Inc. v. Nickel* (1987) 188 Cal.App.3d 1297, 1308-1309.) To operate as a waiver, however, the "the delay [and] . . . the prejudice to the opponent must be extreme." (*Liberty, supra,* 194 Cal.App.4th at p. 845; *Western Continental, supra*, 212 Cal.App.3d at pp. 763-764 ["Delay will not necessarily result in the denial of a disqualification motion; the delay and the ensuing prejudice must be extreme. [Citation.]"].) If the opposing party makes a prima facie showing of extreme delay and prejudice, the burden then shifts to the moving party to justify the delay. (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 599; *Western Continental, supra*, 212 Cal.App.3d at p. 763.)

In this case, we need not consider whether the trustees have made a prima facie showing of extreme delay because they have offered no evidence demonstrating that they suffered extreme prejudice as a result of that delay. Indeed, trustees have offered no evidence or argument on the issue of prejudice. Accordingly, they have failed to make a prima facie showing of an implied waiver.[8]

## DISPOSITION

Let a peremptory writ of mandate issue directing the trial court to vacate its order of February 5, 2013, denying the motion to disqualify Sandler & Rosen from representing the trustees in this matter, and to enter a new and different order granting the motion. Petitioner shall recover its costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.

---

[8] The trustees further assert that we should evaluate a variety of other factors in assessing Fiduciary's disqualification motion, including whether Sandler & Rosen "wrongfully obtained an unfair advantage," the "practical consequences of [its] former representation of [Betty]" and the trustees' interests in selecting the counsel of their choice. However, as discussed at length above, it is well-established that a motion for disqualification predicated on a conflict arising from a successive representation is to be evaluated under the substantial relationship test. We therefore decline to consider the additional factors set forth by the trustees.

28