Filed 5/21/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JUN KI KIM et al., | B255924 |
| Cross-complainants and Respondents. | (Los Angeles County Super. Ct. No. BC459793) |
| v. | |
| THE TRUE CHURCH MEMBERS OF THE HOLY HILL COMMUNITY CHURCH et al., | |
| Cross-defendants and Appellants, | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William F. Fahey, Judge.  Affirmed.

Parker Mills, Gina A. Leago, David D. Yang, for Cross-defendants and Appellants.

Lee Law Offices, W. Dan Lee, for Cross-complainants and Respondents.

_____

Cross-defendants and appellants[1] appeal from a judgment after a court trial in favor of cross-complainants and respondents.[2]  All claims but respondents' claim for declaratory relief were dismissed before trial, and the court found in favor of respondents on that cause of action.  In their timely appeal, appellants contend the trial court made three errors that warrant reversal.  First, the court erroneously found in favor of respondents based on appellants' excommunication from the Holy Hill Community Church (Church) by the Western California Presbytery (WCP).  Second, the court erroneously admitted evidence of events occurring after the cross-complaint was filed.  Third, the court erred when it prevented appellants' counsel from cross-examining a representative of the WCP whose testimony was sought by respondents.  Finding no prejudicial error, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Overview

In early 2011, competing factions emerged within the Church, with one group (the Bang faction, consisting of respondents and others) initially in control.  The WCP intervened, excommunicating the Bang faction and placing the second group (the Cho/Shin faction, consisting of appellants and others) in control of Church operations.  In April 2011, the WCP and appellants initiated the litigation which is the subject of this appeal, and respondents filed a cross-complaint.

---

[1] Cross-defendants and appellants are The True Church Members of the Holy Hill Community Church, Joong Chil Kim, Chan Hyo Tak, Sung Ho Lee, Sung Yeol Yim, Joong Hoon Kim, and Moon Kyu Yu.

[2] Cross-complainants and respondents are Jun Ki Kim, Sang Yoon Cho, and Kwang Nam Kim.

In the spring of 2013, a separate dispute arose between appellants and the WCP, while around the same time, respondents repented for their past actions and sought reinstatement into the Church. On May 11, 2013, the WCP excommunicated appellants and reinstated respondents.

In October 2013, the court held a bench trial and granted respondents declaratory relief. Appellants appealed.

## B. The Church and the Presbytery

The Church is a nonprofit religious organization. It owns valuable real property located near downtown Los Angeles, on Sunset Boulevard (Property). The Church's governing documents are its articles of incorporation and bylaws. The Church's governing body is called the "session," comprised of the pastor, acting as moderator, and Church elders.

In 2007, the Church joined the WCP, which in turn is one of several presbyteries within the Korean American Presbytery Church (KAPC). The WCP and its member churches are governed, in ascending hierarchical order, by the WCP bylaws and the KAPC's Book of Church Order (BOCO). It is undisputed that until April 20, 2013, the Church was a member of the WCP and therefore was subject to the WCP bylaws and BOCO.

## C. 2011 Schism

In late 2010 and early 2011, Reverend Dong Sub Bang, who had been Church pastor since 2003, excommunicated the Cho/Shin faction, consisting of 42 members of the Church, including appellants. The following events then occurred in quick succession: the Cho/Shin faction petitioned the WCP for reinstatement; the Bang faction purported to withdraw the Church from the WCP; and the WCP determined the Bang faction's purported withdrawal was ineffective and removed Bang as pastor of the

Church.  The WCP also removed respondents from their positions as Church elders and reinstated appellants and the other excommunicated members of the Cho/Sin faction.

On April 1, 2011, Bang again attempted to withdraw from the WCP.  He also engaged in discussions with another congregation, LA Sarang, about a possible merger.  Shortly thereafter, the Bang faction and LA Sarang took physical control of the Property and were holding worship services there.  On April 17, 2011, the Cho/Shin faction took back control of the Property.

**D.  Ongoing Dispute over Control of Church Property**

Appellants and other members of the Cho/Shin faction, with the WCP as a co-plaintiff, filed a complaint on April 18, 2011, seeking declaratory relief, an injunction, and an audit and accounting from Bang and respondents.  Bang and respondents filed a cross-complaint on April 22, 2011, claiming trespass and intentional interference with prospective economic advantage, and seeking declaratory relief against appellants and the WCP as cross-defendants.  As concisely described by the trial court in its Final Statement of Decision, "Throughout the rest of 2011 the struggle for control over the [Property] continued.  The litigation in this case was heavy and several interim court orders were entered . . . .  In addition and without authority, Rev. Bang entered into financial arrangements with LA Sarang and other entities which had the effect of encumbering the [Property] and led to other lawsuits which were filed in 2012 . . . ."

In August 2011 and January 2012, the court denied preliminary injunctions sought by Bang and respondents seeking possession and control over the Property.  The orders were upheld on appeal in November 2012.

**E.  Uncertainty over Church Leadership**

While litigation continued, the WCP appointed Albert Shin as the Church's

4

interim moderator in September 2011.[3]  Shin testified at trial[4] that the WCP had authority to appoint an interim moderator, and that the Church would need the WCP's approval for him to be the Church's senior pastor.[5]  The Church did not seek the WCP's approval to make Shin a senior pastor until early in 2013.  Instead of approving the Church's request, the WCP decided to remove Shin as an interim moderator and send Reverend Jong Chun Suh to act as the Church's interim moderator.

**F.  2013 Schism**

After giving notice on April 13, 2013, appellants purported to conduct a congregational vote to secede from the WCP on April 21, 2013.  The WCP, in turn, held a meeting on May 11, 2013, at which it:  (1) concluded the Church's April 21, 2013 congregational meeting was illegal; (2) dismissed Shin from the WCP for his role in the April 21, 2013 meeting; (3) excommunicated appellants and several others from the Church; and (4) reinstated respondents into the WCP and gave them legal and administrative authority to protect Church Property.

The WCP withdrew as a plaintiff on May 9, 2013.  Trial was originally set for July 29, 2013, but was continued to October 2013.  On October 23, 2013, just days before the trial was scheduled to commence, respondents dismissed two causes of action from their cross-complaint and elected to proceed to trial on only their claim for declaratory relief.  The following day, appellants dismissed their entire complaint, and Bang withdrew from

---

[3] Shin replaced Cho, a prior interim moderator, also appointed by WCP.

[4] The court found Shin's testimony lacked credibility as to later events, but there is no evidence to dispute his testimony regarding WCP's approval of pastors.

[5] This is consistent with the Church's bylaws, which state, "To call a senior pastor, the invitation committee should make the recommendation and the Session and the Officers' Committee must pass a resolution and obtain permission from the individual and then obtain more than 2/3 approval from the congregational meeting through a secret anonymous vote before obtaining permission from the affiliated presbytery after which the pastor is to be invited, installed and asked to serve."

the lawsuit, dismissing his claims from the cross-complaint.

## G.  Trial and Final Statement of Decision

Judge Fahey conducted a bench trial limited to the declaratory relief cause of action in the cross-complaint, and only against appellants.  After posttrial briefing, the court issued a tentative statement of decision, considered objections, and then entered a final statement of decision finding in favor of respondents.

## DISCUSSION

"To this appeal, like every other, we apply basic tenets prescribing the scope and limits of appellate review, starting with the most fundamental—the presumption of correctness.  An appealed judgment is presumed to be correct.  We will indulge all intendments and presumptions to support the judgment on matters as to which the record is silent and prejudicial error must be affirmatively shown.  [Citations.]" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267.)

"Article VI, section 13, of the California Constitution provides that a judgment cannot be set aside '. . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'  This fundamental restriction on the power of appellate courts is amplified by Code of Civil Procedure section 475, which states that trial court error is reversible only where it affects '. . . the substantial rights of the parties . . . ,' and the appellant 'sustained and suffered substantial injury, and that a different result would have been probable if such error . . . had not occurred or existed.'  Prejudice is not presumed, and the burden is on the appealing party to demonstrate that a miscarriage of justice has occurred.  [Citations.]" (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833.)

**A. Court Deference to the WCP's 2013 Excommunication and Reinstatement Decisions**

Appellants make four contentions regarding the trial court's treatment of their purported secession from the WCP and the WCP's actions in removing them from the Church. They contend that, contrary to the trial court's ruling: (1) there was no internal dispute permitting the WCP to intervene and assert control in 2013; (2) because any remaining dispute did not involve Church Property, court intervention into matters of Church membership was improper; (3) the WCP's actions were a legal nullity because appellants' secession vote complied with applicable procedures; and (4) the WCP lacked authority to excommunicate appellants because it violated its own procedures by acting in the absence of a petition. None of these contentions meet appellants' burden of demonstrating reversible error.

*1. Standard of Review*

To the extent the facts are undisputed, we review de novo the trial court's conclusion that the ecclesiastical rule limits the court's authority to intervene in disputes relating to ecclesiastical decisions made by the highest authority within a hierarchical religious institution. (*Concord Christian Center v. Open Bible Standard Churches* (2005) 132 Cal.App.4th 1396, 1407-1408 (*Concord Christian*).) "To the extent our determination of this question depends on the judicial interpretation of the articles of incorporation, bylaws, and other governing documents . . . , we must apply neutral principles of law de novo. [Citations.]" (*Id*. at p. 1408.) The court's factual findings are reviewed for substantial evidence, keeping in mind "the well-established standard applicable to any claim that a judgment or finding is not supported by the evidence in the record. Under that standard, we must consider all the evidence in the light most favorable to the prevailing parties, giving them the benefit of every reasonable inference, and resolving conflicts in support of the judgment. [Citations.]" (*Id*. at pp. 1408-1409.)

*2.  Overview of Law Governing Judicial Deference to Ecclesiastical Decisions*

The First and Fourteenth Amendments of the United States Constitution apply to "'severely circumscribe[]'" the role of civil courts in litigation involving religious institutions.  (*Serbian Eastern Orthodox Diocese v. Milivojevich* (1976) 426 U.S. 696, 709 (*Milivojevich*).)  "[W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.  [Citation.]"  (*Ibid*.)  "The prohibition against civil court participation in sectarian disputes extends to issues involving membership, clergy credentials and discipline, as well as religious entity governance and administration.  (*Jones* [*v. Wolf* (1979)] 443 U.S. [595,] 602, 603-604; *Concord* [*Christian, supra,*] 132 Cal.App.4th at p. 1411.)"  (*New v. Kroeger* (2008) 167 Cal.App.4th 800, 815.)

"By definition, a hierarchical church is one in which individual churches are 'organized as a body with other churches having similar faith and doctrine[, and] with a common ruling convocation or ecclesiastical head' vested with ultimate ecclesiastical authority over the individual congregations and members of the entire organized church.  [Citations.]  It has long been established that in such a hierarchical church, an individual local congregation that affiliates with the national church body becomes 'a member of a much larger and more important religious organization, . . . under its government and control, and . . . bound by its orders and judgments.'  [Citations.]  In contrast, a congregational church is defined as one 'strictly independent of other ecclesiastical associations, and [one that] so far as church government is concerned, owes no fealty or obligation to any higher authority.'  [Citation.]"  (*Concord Christian, supra,* 132 Cal.App.4th at p. 1409.)

In *Milivojevich, supra,* 426 U.S. at pages 717-720, the United States Supreme

8

Court held a civil court could not constitutionally invalidate an ecclesiastical decision to defrock a bishop. The decision to defrock the bishop had been made by an ecclesiastical tribunal of a hierarchical church. The Illinois Supreme Court held the defrocking decision could be invalidated by a court because the church's action violated its own policies and rules. The United States Supreme Court concluded: "In short, under the guise of 'minimal' review under the umbrella of 'arbitrariness,' the Illinois Supreme Court has unconstitutionally undertaken the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals of this hierarchical church." (*Id.* at p. 720; see also *Silo v. CHW Medical Foundation* (2002) 27 Cal.4th 1097, 1106 ["selection and termination of clergy or ecclesiastical leadership should be essentially off-limits to courts"].) As originally stated by the United States Supreme Court, within a hierarchical religious entity "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (*Watson v. Jones* (1871) 80 U.S. 679, 727.)

There are limited exceptions to the general rule of judicial deference to ecclesiastical decisions. When a property dispute between two religious groups is susceptible to the application of neutral principles of law, it is proper for the civil courts to apply those principles to the dispute, rather than deferring to the adjudicatory bodies of the relevant ecclesiastical organizations. (*Jones v. Wolf, supra,* 443 U.S. at p. 604 [application of religiously neutral principles permits the court to examine religious documents for language purporting to create trusts in favor of the general church].) As the California Supreme Court recently clarified, "State courts must not decide questions of religious doctrine; those are for the church to resolve. Accordingly, if resolution of a property dispute involves a point of doctrine, the court must defer to the position of the highest ecclesiastical authority that has decided the point. But to the extent the court can resolve a property dispute without reference to church doctrine, it should apply neutral

9

principles of law. The court should consider sources such as the deeds to the property in dispute, the local church's articles of incorporation, the general church's constitution, canons, and rules, and relevant statutes, including statutes specifically concerning religious property, such as Corporations Code section 9142." (*In re Episcopal Church Cases* (2009) 45 Cal.4th 467, 485.)

*3. Substantial Evidence of Internal Dispute*

We are not convinced that reversal is required based on appellants' contention that there was no internal dispute to warrant the WCP's intervention into Church affairs in 2013. Their argument rests on language in BOCO, which states "[w]hen an *internal dispute* arises in the local church that is within the jurisdiction of a presbytery, regarding membership in the presbytery and the ownership of church property, the right to manage the church property shall temporarily be placed within the hands of the presbytery until the dispute is resolved and the normal operation of the local church is restored." (Italics added.) Appellants acknowledge that an internal dispute led the WCP to intervene in early 2011, excommunicating respondents, reinstating appellants, and participating as a plaintiff in filing the complaint in this case. They try to distinguish the WCP's actions two years later by emphasizing that, in the interim, respondents had worshiped and participated in the management of an entirely different church, and that appellants continued to worship in and manage the affairs of the Church. They claim that by the time of this court's November 1, 2012 opinion affirming the trial court's orders denying the Bang faction's motions for a preliminary injunction, the dispute between the two previously internal factions had ended because "[a]t that point, respondents could no longer reclaim their membership or status in the Church, reinstate Bang as Senior Pastor, or otherwise prevail on their cross-complaint." Once the Church had resumed "normal operations," there was no longer an "internal dispute" warranting the WCP's intervention.

Substantial evidence supports the trial court's conclusion that there was "an

10

internal church dispute which exists to this day." "'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . .'" (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143.) "Substantial evidence is evidence that a rational trier of fact could find to be reasonable, credible, and of solid value. Under the substantial evidence standard of review, we view the evidence in the light most favorable to the judgment and accept as true all evidence tending to support the judgment, including all facts that reasonably can be deduced from the evidence, and must affirm the judgment if an examination of the entire record viewed in this light discloses substantial evidence to support the judgment. [Citations.]" (*Mealy v. B-Mobile, Inc.* (2011) 195 Cal.App.4th 1218, 1223.)

The mere fact that both factions—appellants and respondents—continued to participate in this case demonstrates that the dispute continued for at least as long as the case itself. After the trial court twice denied respondents' motions for a preliminary injunction, the parties briefed the matter on appeal, in which the court affirmed the lower court's decision. In March 2012, appellants obtained an injunction against respondents, giving appellants control over the Property. Both the WCP's former attorney Carl Sohn and its moderator Reverend Suh testified about a meeting in March 2013 concerning respondents' ongoing efforts to get the complaint dismissed, as well as the option of settling the dispute. While the character of the dispute may have evolved over the two and a half years this case has been pending, there is no doubt the record contains substantial evidence of the continuing dispute between the two factions. The dispute about who should control Church operations and Church Property that began in April 2011 continued up to and including the WCP's decision to excommunicate appellants and reinstate respondents in April 2013, and continues during the pendency of this appeal.

11

*4. Because There was no Property Dispute, the Court Correctly Deferred to the Decisions of the Highest Tribunal Within a Hierarchical Church, Here the WCP*

Appellants next contend that to the extent a dispute existed, the court lacked jurisdiction to rule on the validity of the WCP's actions because the questions at issue were purely ones of church governance, and doctrine and control of the Church, and none related to title to the Property or application of neutral principles of law to resolve a property dispute. Appellants' argument misconstrues the ecclesiastical rule, which requires courts to defer to the ecclesiastical decisions made by the *highest* authority within a hierarchical religious institution. (*Milivojevich, supra*, 426 U.S. at p. 720 [under the First Amendment, questions of religious polity are left "exclusively to the highest ecclesiastical tribunals of [a] hierarchical church"]; *Concord Christian*, s*upra,* 132 Cal.App.4th at p. 1411 [civil courts must defer to resolution of religious issues by the authoritative ecclesiastical body].) The trial court properly deferred to the WCP's determination that appellants' attempted secession was invalid, and the Church remained subject to the WCP bylaws as well as BOCO. Thus, appellants cannot show the court erred in its application of the ecclesiastical rule.

*5. Based on the Ecclesiastical Rule, We Decline to Entertain Appellants' Arguments Regarding the Validity of the WCP's Actions*

Appellants' last two arguments seek to overturn the trial court's ruling on the grounds that the WCP lacked authority to excommunicate them either because they validly seceded from the WCP or because no one from the Church had petitioned for any action by the WCP. They argue their secession was valid even though the WCP had previously removed Shin as interim moderator, because BOCO rules permitted a "minister from the presbytery" to act as a temporary moderator. However, in arguing the validity of their secession vote, they highlight the entire reason behind the ecclesiastical rule, which is that courts are ill-equipped to interpret ecclesiastical rules, particularly in hierarchical church organizations. No party disputes that the KAPC is a hierarchical

12

organization, consisting of various presbyteries, and that churches are subordinate to both the KAPC and the presbytery to which they belong. (See *Concord Christian*, *supra* 132 Cal.App.4th at p. 1409 [explaining distinction between hierarchical and congregational church structures].)

We have already determined that the court correctly deferred to the WCP's decision as a higher ecclesiastical authority. Similarly, the ecclesiastical rule of judicial deference to the highest authority within a hierarchical church on questions of church governance and church membership requires that we defer to the WCP's decision that appellants' vote to secede did not comply with BOCO, and that the WCP had authority to intervene.

## B. Admission of Evidence Post-Dating the Cross-Complaint

Appellants contend the court erred when it admitted evidence regarding the WCP's May 2013 decisions to excommunicate appellants and reinstate respondents to the Church. They argue that evidence regarding events in 2013 was inadmissible because respondents never sought to amend the cross-complaint filed in April 2011 and appellants had no right to conduct discovery after the October 6, 2012 discovery cutoff.

"Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence. [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) A party challenging a trial court's evidentiary rulings must demonstrate both an abuse of discretion and a consequent miscarriage of justice. (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)

We reject appellants' argument that evidence post-dating the filing of the cross-complaint is inadmissible unless respondents filed a supplemental complaint under Code

of Civil Procedure section 464.[6] Section 464 permits, but does not require, a party to file a supplemental pleading in order to assert a new claim or defense. (See 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1246, p. 690 ["A supplemental complaint or answer is permissive in the sense that no claims or defenses are lost by failure to file it"].) Respondents never attempted to assert any new legal claim or defense. They instead simply sought to introduce evidence relevant to their existing claim for declaratory relief. The bench trial was limited to a single cause of action in respondents' cross-complaint against appellants. The cause of action for declaratory relief described the competing contentions of the two groups as centering around whether the Church is "subject to the authority or control of [respondents or any of them] concerning the ownership, use and control of its property"; and whether respondents "are the duly elected and presently acting members of the Board of Elders of the [Church]." The nature of the relief sought in respondents' 2011 cross-complaint already encompassed facts relevant to respondents' membership status, and because that status remained in dispute as between appellants and respondents when the matter was tried before the court, there was no need to file a supplemental complaint.

Appellants also argue that the court's decision to admit evidence relating the WCP's May 2013 actions amounted to a "trial by ambush" because appellants did not learn of the May 2013 events until July 2013, two weeks before a scheduled July 2013 trial date. According to appellants, they "were forced to proceed to trial, without any discovery or depositions of WCP or KAPC members." However, appellants waived their ability to argue they suffered prejudice because the record does not contain evidence they requested additional discovery or asked the court for additional time to conduct discovery about the recent events. Even taking as true appellants' assertion they became aware of the new facts in July 2013, the trial was continued to October 28, 2013, giving them sufficient time to conduct discovery if needed. Instead, as the trial court pointed out in its

---

[6] All further statutory references are to the Code of Civil Procedure, unless otherwise stated.

opinion, appellants' attorneys "simply objected and failed to seek leave to conduct further discovery, if in fact they really wished to do so." The trial court also noted that appellants' witnesses were permitted to testify about their version of events of early 2013. If anything, counsel's tactical decision against seeking permission to conduct additional discovery relating to May 2013 events waived any objection in that regard. (*Lewinter v. Genmar Industries, Inc.* (1994) 26 Cal.App.4th 1214, 1224.)

## C. Denial Of Opportunity to Cross-Examine the WCP Officers

### 1. Standard of Review

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] . . . However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.]' [Citation.]" (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 848.)

### 2. Relevant Facts

Before considering appellants' arguments that it was prejudicial error to prevent their counsel from cross-examining Reverend Suh, we summarize the relevant facts based on evidence in the record. Although the WCP's corporate status is unclear, appellants do not provide evidence to dispute the trial court's understanding that the WCP is a corporation and Reverend Suh, as moderator of the WCP, was a member of its "control group." (*Nalian Truck Lines, Inc. v. Nakano Warehouse & Transportation Corp.* (1992) 6 Cal.App.4th 1256, 1263-1264 [a corporation's control group includes officers,

directors, and managing agents whose statements and actions may bind the corporation].) The WCP and appellants were co-plaintiffs in the complaint that started the instant litigation, as well as cross-defendants named in respondents' cross-complaint. The WCP and appellants were represented by Attorney Sohn from the time the complaint was filed until May 9, 2013, when Sohn dismissed the WCP from the complaint. Parker Shumaker Mills, LLP (Parker Mills) also acted as counsel for the WCP and appellants as early as September 25, 2012, when Parker Mills attorney David Yang issued a notice of expert deposition on behalf of the WCP and appellants. In addition, the court's final statement of decision notes that Parker Mills appeared in court on October 3, 2012, to represent both the WCP and appellants. Appellants cite to no evidence establishing when Parker Mills ceased acting as counsel for the WCP.

The interests of appellants and the WCP diverged in the spring of 2013, when appellants purported to secede from the WCP, and the WCP, in turn, purported to excommunicate appellants from the Church and reinstate respondents. In the meantime, the litigation between appellants and the WCP, on the one hand, and respondents and Bang, on the other hand, proceeded towards a scheduled July 29, 2013 bench trial. On July 15, 2013, respondents filed a Pre-Trial Report identifying the potential for a mistrial if either of the WCP's former counsel, Parker Mills or Sohn, were permitted to cross-examine Reverend Suh, a WCP representative respondents intended to call as a witness at trial. The trial was continued to October 28, 2013, and Bang filed a document entitled, "Defendant Dong S. Bang's Trial Brief in Support of an Order Enjoining Plaintiffs' Attorneys from Cross-Examining Members of the Western California Presbytery, their Former Client" arguing that any cross-examination of the WCP by its former attorneys would violate the attorneys' duties of loyalty and confidentiality to the WCP as a former client. Appellants filed an opposition, and also addressed the issue in their own trial brief. The issue then came up on the third day of trial, just before counsel for respondents called two representatives of the WCP—Chang Woo Lee and Reverend Suh—to testify. The court deferred the issue until appellant's counsel sought to cross-examine Reverend Suh after he was called a second time as a rebuttal witness for

16

respondents.

When appellant's counsel sought to cross-examine Reverend Suh after respondent's counsel called him during his rebuttal case, the trial court heard appellant's counsel's argument for permitting cross-examination. After confirming that counsel had represented the WCP earlier in the litigation, it rejected appellant's arguments, stating, "Once you undertake that representation, the case law makes it pretty clear that you cannot at a later time confront your own witnesses even if you delegated in part to [co-counsel] Mr. Sohn representation of the WCP. . . . [¶] A bright line has to be drawn about clients not being subjected to examination by their counsel or former counsel even at a time period after it's alleged that the representation ceased."

*3. Law Governing Attorney Disqualification for Conflict of Interest*

The trial court has inherent power "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." (§ 128, subd. (a)(5).) This inherent power includes authority to disqualify an attorney who violates California's ethics rules. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145.) "[D]etermining whether a conflict of interest requires disqualification involves more than just the interests of the parties. [¶] . . . Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. [Citation.] The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process. [Citations.]" (*Ibid.*)

The Rules of Professional Conduct provide that an attorney "shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former

client, the member has obtained confidential information material to the employment." (Rules Prof. Conduct, rule 3–310(E).) An attorney risks violating rule 3–310(E) in two different scenarios: "(1) in cases of successive representation, where an attorney seeks to represent a client with interests that are potentially adverse to a former client of the attorney; and (2) in cases of simultaneous representation, where an attorney seeks to represent in a single action multiple parties with potentially adverse interests." (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159.)

"Case law has developed different standards for attorney disqualification depending on whether the conflict arises out of successive representation or simultaneous representation." (*Montgomery v. Superior Court* (2010) 186 Cal.App.4th 1051, 1055 (*Montgomery*).) Where an actual conflict of interest stems from *simultaneous* adverse representation, the rule almost automatically requires disqualification "'regardless of whether the simultaneous representations have anything in common or present any risk that confidences obtained in one matter would be used in the other. [Citation.]' [Citation.]" (*In re Charlisse C.*, *supra*, 45 Cal.4th at p. 160.) Where the conflict "is one that arises from the *successive* representation of clients with potentially adverse interests, . . . . the governing test requires that the client demonstrate a '*substantial relationship*' between the subjects of the antecedent and current representations." (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283 (*Flatt*.)) "[A] 'substantial relationship' exists whenever the 'subjects' of the prior and the current representations are linked in some rational manner." (*Jessen v. Hartford Cas. Ins. Co.* (2003) 111 Cal.App.4th 698, 711.) "The 'substantial relationship' test mediates between two interests that are in tension in such a context—the freedom of the subsequent client to counsel of choice, on the one hand, and the interest of the former client in ensuring the permanent confidentiality of matters disclosed to the attorney in the course of the prior representation, on the other." (*Flatt, supra*, at p. 283.) "When a substantial relationship has been shown to exist between the former representation and the current representation, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been

18

imparted to the attorney . . . , the attorney's knowledge of confidential information is presumed." (*Global Van Lines, Inc. v. Superior Court* (1983) 144 Cal.App.3d 483, 489.) In such cases, disqualification of the attorney's representation of the second client is mandatory. (*Flatt, supra*, at p. 283.)

*4. Actual Conflict of Interest*

Each of appellants' arguments about why there was no actual conflict that would trigger counsel's ethical obligations under Rule 3-310(E) center around an attorney's duty to preserve attorney-client confidential communications. Appellants argue there was no actual conflict because no one at Parker Mills ever communicated directly with the WCP, and so there were no attorney-client confidential communications. They also argue the joint-representation agreement between the WCP and appellants eliminates any possibility that the WCP communicated information that was intended to be confidential as to appellants. Finally, they argue that counsel's continued representation of appellants cannot be considered adverse because the WCP was no longer a party to the litigation, and any conflict in the WCP's position and appellant's position arose at or near the time the WCP was dismissed from the case. We examine and reject each argument below.

      a.      Presumption of Confidential Communications

Appellants argue there cannot be a conflict between appellants' and the WCP's interests because the WCP never communicated directly with any attorney at Parker Mills, and therefore there was no risk of any Parker Mills attorney disclosing the WCP's confidential communications in the course of representing appellants. They also argue that to the extent Parker Mills may have been privy to confidential information by virtue of their association with attorney Sohn, who was the WCP's primary contact, Reverend Suh waived any attorney client privilege held by the WCP by testifying about his communications with Sohn.

19

This argument ignores the fact that Parker Mills' former representation of the WCP as counsel of record in this case was, by definition, substantially related to the firm's continued representation of appellants *in the same case*. "Where the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm. [Citations.]" (*Flatt, supra*, 9 Cal.4th at p. 283.) Because appellants do not challenge that the two matters are substantially related, the court correctly determined it did not need to inquire into what confidential information, if any, was communicated to Parker Mills, because the existence of such communications is presumed.

Appellants' argument that the WCP waived any attorney-client privilege is also not legally significant, because there is no evidence the WCP consented to its former attorney taking on an adversarial role. A former client must give an unqualified, written waiver before an attorney can ethically act in a capacity that is adverse to his or her former client. (*Montgomery, supra,* 186 Cal.App.4th at p. 1057 [attorney must obtain unqualified, written waiver of any conflict before cross-examining former client who is an expert witness for opposing party].)

b.    Joint Representation Exception is Inapplicable

Relying on *Croce v. Superior Court of City and County of San Francisco* (1937) 21 Cal.App.2d 18 (*Croce*) and *Cornish v. Superior Court* (1989) 209 Cal.App.3d 467, (*Cornish*), appellants argue the prohibition against continuing representation of one client when the representation is adverse to a former client does not apply where the attorney jointly represented the parties in the prior matter. *Croce, supra,* at page 20, relied on the principle that "communications made by parties united in a common interest to their joint or common counsel, while privileged against strangers, are not privileged as between

20

such parties nor as between their counsel and any of them, when later they assume adverse positions." As thoroughly examined and explained in *Fiduciary Trust International of California v. Superior Court* (2013) 218 Cal.App.4th 465, 482-486 (*Fiduciary Trust*), this purported exception to the bar against adverse successive representations has been widely rejected, and its continued viability has been called into question. The *Fiduciary Trust* court concluded that the fact that two adverse parties had previously been jointly represented by the attorney one party now seeks to disqualify does not prevent a court from disqualifying the attorney. (*Id*. at p. 486.) We agree with the holding in *Fiduciary Trust* that the mere fact of joint representation does not preclude disqualifying an attorney when two jointly represented clients' interests diverge.

In *Cornish, supra*, 209 Cal.App.3d at pages 477-478, the court held that disqualification was not required where the attorney had jointly represented a contractor and his subcontractor, but the attorney did not agree to defend the contractor until he had obtained the contractor's informed written waiver of any objection to attorney's continued representation of subcontractor if a conflict arose between the two parties. Appellant has provided no evidence that the WCP gave written consent to Parker Mills continuing to represent appellants should the interests of the two parties diverge, and so we consider *Cornish* inapplicable here.

      c.      <u>Duty of Loyalty and Adverse Representation</u>

We are unconvinced by appellants' argument that disqualification was not warranted because any cross-examination of the WCP would not create an "actual conflict" required to establish an ethical violation. The ethical bar against acting in a manner adverse to a former client's interests implicates not just the duty to maintain client confidences, but the duty of loyalty, which counsel would have violated by cross-examining a representative of their former client. (See *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)

Although the California Supreme Court has emphasized the duty of maintaining

21

client confidences in successive representation cases (see, e.g., *Flatt, supra*, 9 Cal.4th at p. 283), the duty of loyalty also plays a role, as recognized in the longstanding rule that "'an attorney is forbidden to *do either* of two things after severing his relationship with a former client. He may not do anything which will injuriously affect his former client in any manner in which he formerly represented him nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship.'" (*People ex rel. Deukmejian v. Brown* (1981) 29 Cal.3d 150, 155-156, citing *Wutchumna Water Co. v. Bailey* (1932) 216 Cal. 564, 573-574.) *Flatt* held that the "chief" question in successive representation cases is confidentiality, but did not hold that the duty of loyalty may play no part in the trial court's decision on a disqualification motion.

Even if appellants' counsel limited the scope of cross-examination to events occurring after May 9, 2013, if appellant is arguing that the denial of such cross-examination is prejudicial, then we can only presume that the questions would violate the firm's duty of loyalty to its former client. "The spectacle of an attorney skewering her own client on the witness stand in the interest of defending another client demeans the integrity of the legal profession and undermines confidence in the attorney-client relationship." (*Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 467 (*Hernandez*), disapproved on other grounds by *People v. Freeman* (2010) 46 Cal.4th 993.) In other words, cross-examining a former client results in an "actual conflict" prohibited under rule 3-310.

*5. No Unnecessary Delay*

Appellants next argue that respondents waived their right to prevent cross-examination because they engaged in unreasonable delay by waiting until the third day of trial. "'[A]ttorney disqualification can be impliedly waived by failing to bring the motion in a timely manner.' [Citation.] As explained by one court, 'it is not in the interests of justice to make the "substantial relationship" rule so unyielding as to permit the former client to inexcusably postpone objections without penalty. Therefore, a narrow exception

should apply if the present client, by way of opposition, offers prima facie evidence of an unreasonable delay by the former client in making the motion and resulting prejudice to the current client.' [Citation.] To operate as a waiver, however, the 'the delay [and] . . . the prejudice to the opponent must be extreme.' [Citations.] If the opposing party makes a prima facie showing of extreme delay and prejudice, the burden then shifts to the moving party to justify the delay. [Citations.]" *(Fiduciary Trust, supra*, 218 Cal.App.4th at p. 490.)

Appellants' argument ignores the fact that the conflict first arose in April and May of 2013, when appellants voted to secede from the WCP and the WCP excommunicated appellants and reinstated respondents' membership in the Church. Respondents raised the issue of conflict of interest in a pretrial report filed July 2013, just two months after the conflict arose, and more than three months before the bench trial began on October 28, 2013. None of these facts establishes unreasonable delay.

Additionally, appellants have offered no evidence demonstrating that they suffered extreme prejudice as a result of any delay. Appellants' opening and reply briefs make no mention of what appellants sought to elicit through cross-examination that might have changed the outcome of this case. Even if the court erroneously prevented counsel from cross-examining Reverend Suh, appellants have not shown that such an error was prejudicial. Indeed, other than simply protesting their inability to cross-examine a witness they label as a "key witness," appellants do not do not explain what they might have done differently had the issue been raised and/or resolved earlier. We find no unreasonable delay, but even if there had been one, appellants have failed to make a prima facie showing of prejudice.

*6. Trial Court's Inherent Authority to Impose Lesser Sanctions*

Lastly, appellants argue that the court lacked authority to prevent cross-examination, and its only available remedies were to disqualify counsel or declare a mistrial. Appellants are essentially arguing that the court should have exercised its

inherent authority by wielding a bludgeon rather than a scalpel. The court's power to disqualify an attorney stems from its inherent authority under section 128, subdivision (a)(5), to control "the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it . . ." Nothing in the statutory language or the case law supports appellants' argument that the court's exercise of that inherent authority cannot include preventing cross-examination if doing so will also prevent a breach of the ethical canons governing the officers appearing before the court.

In *Hernandez, supra*, 109 Cal.App.4th at page 467, plaintiff initially sought to limit cross-examination of plaintiff's expert witness, on the grounds that the law firm representing defendant was simultaneously representing plaintiff's expert in an unrelated matter. The trial court limited the scope of cross-examination to exclude any cases in which defense counsel previously or currently represented the expert. However, the court allowed defense counsel to impeach the expert based on information obtained from the public record, even though the information related to the same cases giving rise to the conflict of interest. (*Id*. at pp. 464-465.) The reviewing court reversed an order denying plaintiff's motion to declare a mistrial based on the cross-examination, but noted, "Our disposition of this issue should not be construed as suggesting that disqualification of counsel is the appropriate remedy in all cases in which one party's attorney represents an expert designated by the other side. A party's right to select counsel of his or her own choosing may trump the opposing party's freedom to choose an expert whose designation creates a conflict . . . . We can say without hesitation, however, that if the conflict has not been resolved by the time the client/witness is called to the stand, the court is faced with an insuperable obstacle to going forward—an attorney with two clients in circumstances where he or she can be loyal only to one. The court cannot permit, much less preside over, an attorney's attack on his or her own client." (*Id*. at pp. 467-468.) We construe the *Hernandez* opinion as recognizing the crucial role trial courts play in achieving the delicate balance necessary in the exercise of the court's inherent authority, and decline to second-guess the appropriate balance struck by the trial court in this case between appellants' right to retain counsel of their choice and the law firm's duty of loyalty to its

24

former client.

**DISPOSITION**

The judgment is affirmed.  Respondents are awarded costs on appeal.


KRIEGLER, J.

We concur:


MOSK, Acting P. J.


GOODMAN, J.[*]

---