Filed 11/21/25  In re Michael U. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re MICHAEL U. JR. et al., <br><br> Persons Coming Under the Juvenile Court Law. | B345236 <br><br> (Los Angeles County Super. Ct. No. 24CCJP03845) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TERESA U. et al., <br><br> Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Kristen Byrdsong, Judge Pro Tempore.  Affirmed in part, dismissed in part.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant Teresa U.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant Michael U. Sr.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Teresa U. (Mother) and Michael U. Sr. (Father) have four children: Michael Jr. (born 2012), Theodore (born 2014), Raven (born 2017), and Nathaniel (born 2023). Mother and Father both appeal from the juvenile court's assertion of jurisdiction over their children based on domestic violence between the parents, as well as from an order removing the children from both parents.

Neither Mother nor Father denies their history of domestic violence. They instead argue the children were no longer at risk of harm from that violence by the time of the adjudication hearing. They support this argument by pointing to inferences and portions of the record that differ from the inferences drawn and the evidence relied upon by the juvenile court. We, however, do not "reweigh the evidence, or resolve evidentiary conflicts." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) Instead, "we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*Ibid*.) Applying that standard of review, as we must, we conclude substantial evidence supports the court's assertion of jurisdiction.

With regard to the removal order, during the pendency of this appeal the juvenile court returned the children to Mother's care. Given that the children are no longer removed from Mother, her challenge to the removal order is moot. Before the juvenile court, Father requested that the children be returned to Mother as opposed to him, and his appeal of the removal order is therefore also moot.

## FACTUAL AND PROCEDURAL BACKGROUND

We limit our summary of the factual and procedural background to what is necessary to explain our disposition.

### A. Facts Leading to the Filing of the Dependency Petition

#### 1. *Prior Referral History*

The family was first referred to the Los Angeles County Department of Children and Family Services (DCFS) in May 2014. The referral alleged that Father had committed domestic violence against Mother in Michael Jr.'s presence by pushing her against a vehicle and grabbing her by the neck. Mother reported the incident to law enforcement and entered a domestic violence shelter. Mother also stated there had been numerous prior unreported incidents of domestic violence. Mother was issued an emergency protective order and granted temporary custody of Michael Jr. (who was at that point the parents' only child). DCFS closed the referral as inconclusive.

A second referral occurred in September 2019. The caller, who lived near Mother and Father, reported hearing Father beating Mother every night for the past two weeks. The referral stated that the caller also had received information from the caller's family (who was present when the caller was away from

home) that yelling and screaming was coming from Mother and Father's house, that it sounded like the parents were hitting each other, and that the children in Mother and Father's home were screaming for someone to call the police. The caller reported Father belonged to a gang and had made threats when told he needed to stop fighting or his children would be removed from him. DCFS closed the referral as inconclusive.

A third referral, in June 2020, alleged Father had violated a domestic violence restraining order (DVRO) against him that protected Mother, Michael Jr., Theodore, and Raven, and that Father otherwise endangered those three children. The referral stated that Father had entered Mother's home through a second story window and gone into the children's bedroom. Mother and maternal grandmother became aware Father was in the house. Maternal grandmother offered to call 9-1-1 to report Father's restraining order violation; Mother stopped maternal grandmother from doing so, stating the children were happy to see Father and " 'he was alright.' " Father later became agitated after learning Mother was going to move out of the home, and maternal grandmother called 9-1-1. When police arrived, Father had barricaded himself inside the bedroom with Michael Jr., Theodore, and Raven, and used them as human shields when officers forced entry into the room to arrest Father. DCFS substantiated the referral for general neglect and promoted it to a court case. The case was later closed in August 2020 because Father went to prison for violating the DVRO. In connection with his criminal case, Father was subjected to a 10-year criminal protective order (CPO) restraining his contact with Mother; the CPO was issued in December 2020 and expires in December 2030.

4

A fourth referral, in April 2022, alleged emotional, physical, and at-risk sibling abuse. According to the referral, Theodore reported Father scratched the child's wrist when trying to spank him. The referral further alleged Theodore was misbehaving at school, that the parents had a history of domestic violence, and that it was unknown if there was current domestic violence. DCFS closed the referral as inconclusive/unfounded.

2.   *October 16, 2024 Referral*

On October 16, 2024, DCFS received a referral stating that police officers had responded to a call reporting domestic violence involving Mother that ended in Father's arrest. The reporting party spoke with Mother, who said that Father kicked her side and slapped her face causing a bloody nose. All four children were present during the violence. The reporting party provided information that law enforcement had been to the home 12 times before this incident.

When contacted on October 22, 2024 by DCFS, Mother said she was at home but unavailable to meet until the following week. This also stymied DCFS from speaking with the children as Mother homeschooled them. Mother did not respond to attempts by DCFS to contact her on October 30 and 31. Mother texted DCFS on November 3, 2024 stating her phone was broken, that it had taken longer than she expected to get a replacement, and that she was still too busy to meet but was available the following week. Mother eventually spoke with DCFS by phone on November 5, 2024. Mother reported she was afraid to go home and was staying in a hotel. Father was gang affiliated and out on bail, and Mother's friends had told her he was in the area where her home was located. Mother also said paternal grandmother had threatened her.

5

During the call on November 5, Mother agreed to bring the children to a local park on November 12, 2024, to meet with DCFS. Mother never showed up and was not at home when DCFS looked for her there. DCFS continued to be unable to reach Mother when contacting her on multiple occasions in November and December 2024 to follow up. Mother refused to cooperate with police following Father's arrest; she further denied an assistant district attorney permission to speak with the children.

As Mother made herself unavailable, DFCS consulted law enforcement to get further information about what occurred on October 16, 2024. The officers on scene had spoken with Mother but did not interview the children. Mother told the police she and Father were married but had been separated for approximately four years. Father came to her home unannounced approximately two weeks before the assault and had remained there since. Once he was at the home, Father did not permit Mother to leave it. In the days leading up to October 16, Father hit Mother, including with clothes hangers. Mother did not call law enforcement because Father had taken her telephone. Mother and Father argued the day of the incident and Father slapped the side of her face, causing her nose to bleed; he also kicked her leg. The children witnessed the assault. Mother was eventually able to leave the house when Father was showering, find a telephone, and call the police. When the police arrived, they found Father inside the home. Although Mother did not have marks or bruises on her, she showed the police the bloody clothing she was wearing when her nose bled. The police arrested Father for intimate partner battery.

A DCFS records search found a DVRO protecting Mother, Michael Jr., Theodore, and Raven from Father that was in effect between December 13, 2019, and December 12, 2022. The DVRO required Father to participate in a 52-week batterers' intervention program and that he not be alone with the children "pending agreement of Mother – or further court order." The records search also showed Father had a lengthy criminal history that included multiple arrests between 2000 and 2024, and convictions for possession of a controlled substance for sale, being a felon in possession of a firearm, obstruction/resisting an executive officer, stalking, inflicting corporal injury on a spouse or cohabitant, and driving under the influence.

DCFS attempted to contact Father in November 2024 without success.

## B. Dependency Petition and Initial Hearings

On December 9, 2024, DCFS filed a Welfare and Institutions Code[1] section 300 petition alleging all four children were at risk of harm due to the parents' history of domestic violence and the parents not complying with the terms of the CPO. As Mother remained incommunicado, the court issued protective custody warrants for the children and arrest warrants for the parents. Mother eventually surrendered the children to DCFS on December 27, 2024, and the court recalled the warrants. The court placed the children with paternal grandmother.

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

## C. Additional Investigation Before the Adjudication and Disposition Hearing

After the children were detained, DCFS conducted further investigation. The family's legal history included Mother filing for a DVRO against Father in May 2014. Mother failed to prosecute the request, and the temporary restraining order was dissolved in June 2014. Mother filed another DVRO request in November 2019. This time she went forward with the case and the court granted her a three-year DVRO against Father. As mentioned previously, this order was in effect from December 2019 until December 2022; it also granted Mother sole custody of Michael Jr., Theodore, and Raven with Father having monitored visits.

Mother continued to dodge engaging with DCFS. She refused to consent to DCFS speaking with the children regarding the issues in the section 300 petition.[2] Mother initially refused to meet with DCFS until she had legal counsel or another advocate with her; she later sent a message agreeing to speak telephonically but not in person. At some point, criminal charges against Father related to the October 16, 2024 incident were dismissed. Mother refused to provide information to DCFS about the October 16, 2024 incident, saying because the criminal case was dismissed "I won't bother commenting [on] it because it was struck out." She later provided some confirmatory details about Father's actions on October 16. She also stated Father had come by the family home beforehand to say he would later return to

---

[2] DCFS was able to speak with the children about things such as sleeping arrangements in the home and to confirm they had no marks or bruises indicative of abuse.

8

drop off money to help Mother out.  She responded, however, to a follow-up question about how long Father was in the home when he returned by saying, "I don't really want to get into details because the court threw it out."

Mother said she was being harassed by Father and needed help to move as she had no family support.  Mother said she and Father had an altercation approximately five years ago, after which they separated and were no longer together.  Since that time, Father no longer lived in the family home.  Mother did not explain how Nathaniel (who was born in August 2023) was conceived if she was no longer seeing Father.[3]  Paternal grandmother also appeared to partially contradict Mother's claim about the length of the parents' separation, saying Mother and Father had been separated for "quite some time" but before that had been in an on-again, off-again relationship for years.

Mother told DCFS she obtained a restraining order after the 2020 incident, which she initially thought lasted for 10 years

---

[3] Mother's reply brief hypothesizes, without any supporting citation to the record, that the "likely scenario" was "that Nathaniel's birth was the consequence of [F]ather raping [M]other."  "It is axiomatic that an appellant must support all statements of fact in [her] briefs with citations to the record." (*Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 29.)  "We look askance at . . . stating what purport[s] to be facts—and not unimportant facts—without support in the record.  This is a violation of the rules . . . with the consequence that such assertions will, at a minimum, be disregarded."  (*Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.* (2011) 194 Cal.App.4th 839, 846.)

but later learned was only in effect for three years.[4] Father continued to harass her, and she usually would call the police when this happened. Mother said she was granted an emergency protective order on October 16, 2024, but did not file a request for a DVRO when the emergency order expired because she had gone to Las Vegas. Mother claimed she left a voicemail with DCFS that she was in Las Vegas and would be unable to meet on November 12; DCFS disputed this claim, stating its last contact with Mother was on November 5 when she agreed to meet with DCFS on November 12 at a local park, and that Mother never informed DCFS she was in Las Vegas or would be unable to meet as promised.

DCFS later gave Mother an opportunity to clarify any other information in its jurisdiction/disposition report she thought was incorrect. Mother initially declined, saying it was pointless because DCFS had already perpetrated a story about her that others would believe. She then claimed that she had accidentally damaged her phone and was unable to replace it so that she did not know if DCFS was trying to call her after November 5.

---

[4] Mother's confusion on this point was understandable. She obtained a three-year DVRO in 2019. After the 2020 incident, the criminal court issued a 10-year CPO against Father with Mother as a protected party. It appears that for some unknown and to this court quite concerning reason the CPO did not show up when the police or DCFS initially searched for it after the October 16, 2024 incident, leading them to believe the then-expired three-year DVRO was the only restraining order in existence. Mother herself ultimately had to provide a copy of the CPO protecting her.

Mother also told DCFS the statement that she refused to let law enforcement speak with the children was false.

Mother said she had PTSD from her interactions with Father, and talking about those interactions in counseling or hearing about them in court aggravated her trauma. Mother was residing with a friend because she was afraid Father would show up at her home, and stated she had an intake appointment with a program that provided women and their children shelter at a confidential location. The shelter confirmed Mother had completed her intake and would be able to move in there in early February 2025. Mother also said she was on a waitlist for mental health services; DCFS confirmed this was accurate. Mother began attending parenting classes and individual counseling. She had an intake appointment for a domestic violence program but had not yet started participating in the program.

Mother said she homeschooled Michael Jr., Theodore, and Raven; Nathaniel was not yet school-aged. Mother said all four children had autism and two of them were regional center clients. The regional center, however, had no record that the children were current clients. During an early interview, one of the boys described the children's homeschooling as "play[ing] video games all day." Mother denied this and described the children's daily routine including the homeschooling program she used. Mother was not opposed to enrolling the children in traditional schooling so long as it met the children's special needs. DCFS undertook working with Mother to enroll the children in in-person school and to receive regional center services.

Mother visited with the children when they were in paternal grandmother's care. These visits included overnights that were not court-approved. When DCFS was finally able to

speak with the children, each of them stated they could not remember or did not want to share key facts about what had happened between Mother and Father. Theodore said he had not seen Mother and Father fight, but also said that he wished "peace" for his family "[l]ike when there is no fighting, no arguing and separating." Michael Jr. said he could not remember details about law enforcement responding to the home because "there's been too many police visits."

Father continued to refuse to make himself available to DCFS or to provide information despite multiple outreach attempts. Father did not visit with the children due to the CPO.

**D.     The Jurisdiction and Disposition Hearing**

The juvenile court held a combined jurisdiction and disposition hearing on March 25, 2025, at which both Mother and Father were present. Counsel for DCFS and the minors asked the court to sustain the petition. Mother's counsel asked the court to strike Mother from the petition, alleging there was no current risk to the children given her participation in services and that she was not around Father. Father's counsel asked the court to dismiss the petition entirely.

The court sustained the petition as pleaded and asserted jurisdiction over all four children. The court found a long-standing and still unresolved history of domestic violence between the parents based on (1) Mother's reluctance to enforce the protective order in 2020 when Father came to her home, which ended in the children "being used as barricades," (2) Mother not enforcing the restraining order in place from 2020 until 2023, and instead engaging in an "on-again, off-again relationship with [Father that resulted in] having Nathaniel," (3) the police description in connection with the October 16, 2024

12

incident that they had been called to Mother's house 12 previous times, and (4) the statements from Theodore and Michael Jr. indicating their exposure to domestic violence. The court found a current risk to the children because Mother had continued to "put herself and her children in a situation and minimized [the problem of] domestic violence, which is why she really needs . . . counseling to address her longstanding history and have the strength to make better choices in the future."

As for disposition, the court removed the children from both parents' custody and ordered them suitably placed, made visitation orders, and ordered DCFS to provide both parents with reunification services.

## E.    The Court Returns the Children to Mother

While this appeal was pending, on August 12, 2025, the juvenile court terminated its removal and suitable placement order, and ordered the children returned to Mother's home.

## DISCUSSION

## A.    Substantial Evidence Supports the Court's Jurisdictional Orders

Mother does not deny the past domestic violence between Father and her, or that the children were present during it. She instead asserts the juvenile court erred in asserting jurisdiction because, by the time of the March 25, 2025 adjudication hearing, there was no longer any significant risk of harm to the children that would support exercising dependency jurisdiction. Father joins in Mother's contentions but makes no independent argument.

13

1. *Relevant Law and Standard of Review*

For an assertion of jurisdiction to stand, "a significant risk to the child must exist ' "at the time of the jurisdiction hearing." ' " (*In re J.N.* (2021) 62 Cal.App.5th 767, 775.) It is the substantial evidence supporting this jurisdictional element, and only this element, that Mother challenges on appeal.

We review a jurisdictional finding for substantial evidence in light of the entire record. (*In re I.C.* (2018) 4 Cal.5th 869, 892.) " 'To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.' " (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts." (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947.) "[W]e draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*Ibid*.)

2. *The Children Still Faced Substantial Risk of Harm at the Time of the March 2025 Jurisdictional Hearing*

In arguing against the court's finding of a current risk of harm, Mother highlights the following post-October 16, 2024 facts: there were no additional domestic violence episodes after the October 16 incident; the parents had stayed away from one another since that incident; Mother had not let Father see the children after the October 16 incident; and Mother was willing to and had already begun engaging in services.

Those facts did tip in Mother's favor, and we commend these efforts on behalf of her children and herself. However, the juvenile court was entitled to credit other evidence that indicated

14

the children remained at significant risk of substantial harm. Despite Mother's claim that she and Father had not been in a relationship for approximately five years (since the 2020 incident where Father used the children as human shields against police), paternal grandmother reported that Mother and Father had been in an on-again, off-again relationship and Nathaniel's birth in late August 2023 indicated the parents continued to have an intimate relationship. Mother declined to provide details on how long Father was in the home before the October 16, 2024 incident, leading to the inference he had been there longer with Mother's permission before the domestic violence that led to the referral. Mother did not comply with protective orders at least twice: when initially refusing to contact the police in 2020 when Father visited the home, and later when Nathaniel was conceived. There was also evidence that Mother refused to cooperate with law enforcement following the October 16, 2024 incident, sought to evade DCFS by fleeing to Nevada and giving a false explanation of her failure to inform DCFS of the children's whereabouts, and kept the children from speaking with DCFS until she felt sufficiently confident they would not say anything incriminating about the relationship between Mother and Father (including how long he was in the home before Father's October 16, 2024 arrest). Additionally, Mother had started the process to enroll in domestic violence counseling but had not yet attended any sessions. Considered together, these facts could reasonably lead the court to doubt Mother had yet sufficiently separated from Father or taken sufficient steps to break the cycle she had been in for many years, and thus that the children continued to be at substantial risk of harm as of the time of the jurisdictional hearing.

Mother's reliance on *In re Ma.V.* (2021) 64 Cal.App.5th 11, *In re M.W.* (2015) 238 Cal.App.5th 1444, and *In re Daisy H.* (2011) 192 Cal.App.4th 713, disapproved on another ground in *In re D.P.* (2023) 14 Cal.5th 266, 278, to argue there was no current risk of harm is unpersuasive. *Ma.V.* involved a single act of domestic violence, after which it was undisputed that the perpetrator left the family home and the mother had ended her relationship with him. (*In re Ma.V., supra*, at pp. 14, 22-23.) *M.W.* involved a single act of domestic violence that occurred more than seven years before the juvenile court asserted jurisdiction. (*In re M.W., supra*, at pp. 1451, 1454.) The domestic violence in *Daisy H.* occurred outside the children's presence and "happened at least two, and probably seven, years before the DCFS filed the petition." (*In re Daisy H., supra*, at p. 717.) In contrast, the violence between Mother and Father here was both repeated and recent, occurred in the children's presence, and the court could reasonably infer that Mother had not yet taken necessary steps to protect the children from the risk of harm posed by the domestic violence.

We accordingly conclude substantial evidence supports the juvenile court's assertion of jurisdiction as to Mother. As Father makes no argument independent of Mother, we likewise conclude the court did not err in asserting jurisdiction as to Father.

## B.     The Parents' Appeal of the Removal Order is Moot

Mother concedes her challenge to the removal order is moot as the juvenile court has since returned the children to her home. As Mother does not argue we should address this now moot issue, we dismiss her appeal of that order. (*Parkford Owners for a Better Community v. County of Placer* (2020) 54 Cal.App.5th 714,

722 [" 'When events render a case moot, the court . . . should generally dismiss it' "].)]

Father makes no argument that the court erred in removing the children from his care. At the disposition hearing, Father did not ask the juvenile court to return the children to him; he asked the court to return the children to Mother. As that has now occurred, his appeal of the removal order is likewise moot and should be dismissed.

## DISPOSITION

The juvenile court's jurisdictional orders are affirmed. Mother and Father's appeals of the removal orders are dismissed as moot.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

M. KIM, J.

17